797 A.2d 138

RICHARD SHELCUSKY AND DONNA SHELCUSKY, HIS WIFE, PLAINTIFFS–APPELLANTS, v. AL GARJULIO, INDIVIDUAL-LY AND/OR DOING BUSINESS AS INTERSTATE TRUCKING, JOHN MARTINEZ, STERLING WINTHROP, INC., DOING BUSI-NESS AS L & F PRODUCTS, KODAK, JOHN DOES #1–#16, JOHN DOES 17–21 (UNKNOWN PERSONS AND/OR ENTITIES) AND JOHN DOES 22–25 (UNKNOWN PERSONS AND/OR ENTI-TIES), DEFENDANTS, AND CROWN EQUIPMENT CORPORA-TION, DEFENDANT–RESPONDENT.

Argued March 12, 2002—Decided May 22, 2002.

*Robert J. Forrest,* argued the cause for appellants (*Lieberman, Ryan & Forrest,* attorneys; *Craig Voorhees,* on the brief).

*Robert M. Leonard,* argued the cause for respondent (*Drinker Biddle & Shanley,* attorneys; *Stacey P. Rappaport,* on letter in lieu of brief).

The opinion of the Court was delivered by

LaVECCHIA, J.

Plaintiff was injured severely in an explosion at work while using a forklift to load· pallets of rejected, leaking aerosol cans. In this failure-to-warn action against the manufacturer of the forklift, plaintiff alleges that if the defendant had supplied an adequate warning to alert potential users that that model of forklift could not be used to transport flammable materials, he would have found out what he was loading and not used that forklift. The trial court concluded that plaintiff had failed to establish a genuine issue of material fact concerning proximate cause and granted

summary judgment to defendant. The court held that because no one in the workplace thought that finished aerosol cans, even if they were "rejects," were flammable, there was no triable issue on whether the failure to warn was the proximate cause of plaintiff's injuries. When plaintiff submitted moving papers that included a second affidavit related to that issue, the trial court refused to consider the motion.

The Appellate Division affirmed the trial court, including the court's refusal to consider the second affidavit. The panel determined that the affidavit contradicted plaintiff's earlier deposition testimony and his prior affidavit, and therefore raised only a sham factual dispute. Thus, in our review of the Appellate Division's determination, we have the opportunity to address the question whether to accept the "sham affidavit" doctrine that arose as a part of the federal law governing summary judgment practice under Rule 56(c) of the Federal Rules of Civil Procedure.

I.

Plaintiff Richard Shelcusky received severe burn injuries in an explosion that occurred in 1996 while he operated a standard E-type electrically powered forklift at his place of employment, Reckitt & Coleman, Inc. (R & C). The forklift was manufactured by Crown Equipment Corporation (Crown). R & C is a production facility that manufactures household aerosol products such as Lysol, Wizard Air Freshener, and Resolve Carpet Cleaner. The products contain an ignitable mixture of the aerosol gases isobutane and propane.

At the time of the accident plaintiff had been employed at R & C for sixteen years. Between 1984 and 1996 he worked as a material handler and later as a production worker. Both of those jobs required him to operate forklifts on a daily basis.

The explosion occurred while plaintiff was using a Crown forklift to load pallets of boxes filled with damaged aerosol cans into an enclosed forty-foot tractor-trailer. Plaintiff testified during his

deposition that he did not know what was contained in the boxes he was loading at the time of the accident:

Q. And, again, do you know what kind of product you were loading on there? Was it all the same?

A. I have no idea.

Q. Was it all aerosol materials?

A. Like I said, I have no idea.

Q. You just don't know anything about the nature of the materials?

A. Correct.

The explosion occurred during plaintiff's seventh load. The forklift was halfway inside the tractor-trailer and plaintiff was about to put it into reverse when the forklift ignited flammable aerosol gases that had accumulated in the tractor-trailer's bay. The fire that erupted caused first- and second-degree burns over a significant portion of plaintiff's body.

After sixteen years of employment at the R & C facility, plaintiff was aware that there were explosive and flammable materials on the premises. During his deposition the following exchange took place:

Q. Did anybody at Reckitt & Coleman ever tell you that you had to be careful because there were explosive materials at the facility?

A. No.

Q. Were you aware that there were explosive materials at Reckitt & Coleman?

A. Yes.

Q. How did you become aware of that?

A. How did I become aware of that, there were explosives? Common sense will tell you that things are filled by gas and that things could ignite.

Plaintiff claims that even though he did not know at the time of the accident that he was loading rejected, leaking aerosol cans, he knew that such cans contained flammable gases and vapors. In support of that contention, plaintiff's co-worker David Lambert submitted a certification stating that he also was aware that such products were flammable:

For 13½ years I manufactured products such as Lysol and Vanasol which contained the propellant[ ] Isobutane. I was aware that these materials were flammable. In fact, there was an explosion at what is now Reckitt & Coleman where I was working due to Isobutane igniting. This explosion was referred to in the OSHA report that investigated the injury to Mr. Shelcusky.

Plaintiff asserts that he did not know that the specific type of forklift he was using could ignite flammable gases and vapors because it did not provide an adequate warning. It is undisputed that there were no warnings on the forklift used by plaintiff. During his deposition plaintiff testified that had there been a warning he would have followed its instructions:

Q. What I'm really asking about is not if there's some problem with the operation, but, rather, if you see a label on the truck, was it your practice to follow the instruction contained in the labels?

A. Yes.

Q. And are you telling us you followed each and every instruction on the labels that you saw?

A. Yes.

According to Robert King (King), R & C's Human Resources Manager, three models of forklifts were used at the facility at the time plaintiff was injured. Type–E forklifts were used to move finished products and Type–EE or EX forklifts were used to move flammable raw materials. R & C considered boxed rejected aerosol cans, such as the cans plaintiff was moving at the time of the accident, to be "finished" products. Crown contends that neither R & C nor its employees knew that the rejected damaged and leaking cans were flammable. In his testimony, King stated the matter in a different way: "[W]e had no understanding that handling finished product[s] whether it was acceptable or rejected, we had no knowledge that handling it with other than an E rated truck was a problem." Therefore, according to King, a worker usually would use a Type–E forklift to do the type of work assigned to plaintiff on the day of the accident.

Plaintiff's expert, Dr. Burton Z. Davidson, prepared a preliminary fire safety engineering report analyzing the most probable cause of the accident and ways in which the accident could have been avoided. His report was based on, among other things, a review of the local police department's investigation report, an Occupational Safety and Health Administration (OSHA) report on the accident, and a telephone interview with plaintiff.

Dr. Davidson found that "the ignition source for the fiery incident was one or more electrically energized components of the E–Type forklift truck that [plaintiff] was operating while working inside the trailer[,]" and that "[t]he fuel energy for the fiery episode was fugitive aerosol gases (i.e., isobutane and propane) that formed ignitable concentration in-and-around the forklift truck." Dr. Davidson's report stated that only a Type–EX forklift should have been used to load safely the rejected aerosol cans. He concluded:

Clearly, the manufacturer of the subject forklift (Crown) was safety responsible for the fiery incident because they failed to warn [plaintiff] on the forklift itself (e.g. dashboard) not to use or operate the forklift in locations where fugitive flammable gases can or do accumulate in the work place (e.g. due to leakage) .... Crown could and should have foreseen this fire danger and they could and should have taken (but did not take) effective steps to warn end-users (like [plaintiff]) on the dashboard (or equivalent ultimate point-of-risk location) of the fire ignition energy danger of an E-type forklift. *Their product was dangerous to users lacking an appropriate on-product, ultimate point-of-risk fire danger warning label (or equivalent). The fire danger clearly arises out of a predictable use of an E-type forklift in an industrial setting.*

[(emphasis added).]

Following the explosion, OSHA conducted an investigation and prepared an accident report that cited R & C for several violations and imposed penalties. The report stated:

Aerosol cans of household products such as "Wizard Air Freshener," "Resolve Carpet Cleaner," etc. contain a flammable hydrocarbon propellant blend of isobutane and propane. Containers were stored without being adequately checked to assure they were not leaking. Further, they were not checked to assure they would not leak once prepared for removal from the storage area.... The forklift used to transport [the cans] presented a source of ignition which posed a fire and/or explosion hazard.

The report also concluded that "[e]mpl[oyees] were led to believe that the containers were safe to handle once they became a finished product, and/or once the material was in the container." The report noted that all of the employees that were interviewed as part of the investigation indicated that they did not consider these particular cans to be a hazard. The employees interviewed stated that they believed the boxed rejects were "finished" products that were safe even if the individual cans were damaged and leaking.

In his amended complaint plaintiff alleges that Crown violated provisions of the New Jersey Products Liability Act, *N.J.S.A.* 2A:58C–1 to –11, because the forklift was not reasonably fit, suitable or safe for its intended purposes. The allegations are based on Crown's failure to place warnings on Type–E forklifts that would have alerted operators that the product should not be used in the presence of flammable materials.

After the close of discovery defendant moved for summary judgment, and plaintiff submitted a certification in opposition to the motion that stated, in part:

At the time I was injured I did not know what I was loading, and I had no reason to inquire as to the contents of what I was loading. If it was important to determine what I was loading I would have discovered that the items I was loading were rejected damaged cans that were leaking flammable gases . . . .

Because I was aware that there were flammable materials on the premises, a warning not to use the type E forklift where flammable gases or vapors were present would have alerted me to discover that the items I was loading were rejected damaged cans and thus would have prevented me from using the E type forklift and getting injured.

The court granted the motion for summary judgment, finding that plaintiff had failed to prove that Crown's failure to warn proximately caused his injuries because plaintiff's employer did not consider the leaking cans he was loading to be flammable. The court reasoned that even if a warning existed, plaintiff would have had to ask R & C officials if the leaking cans he was loading were flammable. Because his employer would have told him that they were not, he would have disregarded a warning. Thus, the court found that, "no reasonable finder of fact could determine that Crown's failure to warn was the proximate cause of the Plaintiff's injuries," as is required under a failure-to-warn product defect claim.

Plaintiff moved for reconsideration. In support of his motion, he submitted a certification by his co-employee, David Lambert. Lambert's certification stated that he was aware that the products manufactured at R & C were flammable. Plaintiff contended that the certification was submitted to show that he would not have had to ask his employer whether the items he was loading were

flammable. The court rejected that argument and denied the motion, finding that plaintiff had failed to prove that either he or his co-workers considered aerosol cans to be a potential fire hazard.

Plaintiff then filed a second motion for reconsideration with another supporting certification. The new certification stated:

> I knew prior to my accident that the rejected and leaking aerosol cans I was loading were flammable and that they contained flammable gases and vapors. A warning not to use the Type E forklift where flammable gases and vapors were present would have prevented me from using the E Type forklift. Such a warning would have caused me to inspect what I was loading and I would have seen that I was loading rejected damaged cans which I knew were flammable.

Prior to oral argument on the motion, plaintiff was informed that the court would not consider the motion and that it had been removed from the motion calendar.

The Appellate Division affirmed, concluding that no genuine issue of material fact existed to demonstrate that defendant's failure to warn was the proximate cause of plaintiff's injuries. *Shelcusky v. Garjulio*, 343 *N.J.Super.* 504, 511, 778 *A.*2d 1176 (2001). Recognizing that plaintiff should receive the benefit of all positive inferences drawn from the facts, and that it should refrain from passing on plaintiff's credibility, the panel nonetheless determined that the court below was not required to accept "a purely self-serving certification by plaintiff that directly contradicts his prior representations...." *Id.* at 510, 778 *A.*2d 1176.

We granted certification, 170 *N.J.* 390, 788 *A.*2d 774 (2001), to consider the applicability of the sham affidavit doctrine generally and to review the correctness of the grant of summary judgment to defendant.

## II.

### A.

The Appellate Division affirmed the trial court's refusal to reconsider its grant of summary judgment to defendant, essentially applying the sham affidavit doctrine. *Shelcusky, supra,* 343

*N.J.Super.* at 510, 778 *A.*2d 1176. That term refers to the trial court practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony. Collin J. Cox, *Reconsidering the Sham Affidavit Doctrine,* 50 *Duke L.J.* 261, 262 (2000). The doctrine calls for rejection of the affidavit where the contradiction is unexplained and unqualified by the affiant. In such circumstances, the alleged factual issue in dispute can be perceived as a sham, and as such it is not an impediment to a grant of summary judgment.

The sham affidavit doctrine can be traced to the Second Circuit's decision in *Perma Research & Development Co. v. Singer Co.,* 410 *F.*2d 572 (2d Cir.1969). Recognizing that the plaintiff in *Perma* could not justify an inconsistency between his deposition testimony and a later affidavit submitted in opposition to a motion for summary judgment, the court stated:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

[<em>Id.</em> at 578.]

In concluding that the affidavit raised a sham issue of fact, the Second Circuit noted that the affiant failed to demonstrate that it did not have access to material facts at the time of the earlier deposition testimony or that the affidavit contained newly discovered evidence creating a justifiable contradiction. *Ibid.* Thus, the affidavit was not permitted to upset the court's determination that no genuine issue of material fact existed. *Ibid.*

Following the Second Circuit's decision in *Perma,* all federal circuits that have considered application of the doctrine in their jurisdictions have adopted it in some form. *See Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 *F.*3d 1, 4–5 (1st Cir.1994); *Martin v. Merrell Dow Pharm., Inc.,* 851 *F.*2d 703, 706 (3d Cir.1988); *Barwick v. Celotex Corp.,* 736 *F.*2d 946, 960 (4th Cir.1984); *Albertson v. T.J. Stevenson Co.,* 749 *F.*2d 223, 228 (5th Cir.1984); *Reid v. Sears Roebuck and Co.,* 790 *F.*2d 453, 460 (6th

Cir.1986); *Darnell v. Target Stores,* 16 *F.*3d 174, 176 (7th Cir. 1994); *Camfield Tires, .Inc. v. Michelin Tire Corp.,* 719 *F.*2d 1361, 1364–65 (8th Cir.1983); *Radobenko v. Automated Equip. Corp.,* 520 *F.*2d 540, 544 (9th Cir.1975); *Franks v. Nimmo,* 796 *F.*2d 1230, 1237 (10th Cir.1986); *Van T. Junkins & Assocs. v. U.S. Indus. Inc.,* 736 *F.*2d 656, 657–59 (11th Cir.1984); *Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 *F.*2d 494, 498 (Fed.Cir.1992), *cert. denied,* 508 *U.S.* 912, 113 *S.Ct.* 2346, 124 *L.Ed.*2d 256 (1993).

Similarly, most states that have addressed the issue of offsetting affidavits have chosen to adopt a rule that is consistent with the sham affidavit doctrine. *See, e.g., Robinson v. Hank Roberts, Inc.,* 514 *So.*2d 958, 961 (Ala.1987); *Wright v. Hills,* 161 *Ariz.* 583, 780 *P.*2d 416, 420–21 (Ariz.Ct.App.1989), *abrogated on other grounds, James, Cooke & Hobson, Inc. v. Lake Havasu Plumbing and Fire Prot.,* 177 *Ariz.* 316, 868 *P.*2d 329 (Ariz.Ct.App.1994); *Caplener v. Bluebonnet Milling Co.,* 322 *Ark.* 751, 911 *S.W.*2d 586, 589–90 (1995); *Nutt v. A.C. & S. Co.,* 517 *A.*2d 690, 693 (Del.Super.Ct.1986); *Hancock v. Bureau of Nat'l Affairs, Inc.,* 645 *A.*2d 588, 590–91 (D.C.App.1994); *Inman v. Club on Sailboat Key, Inc.,* 342 *So.*2d 1069, 1070 (Fla.Dist.Ct.App.1977); *Tri–Cities Hosp. Auth. v. Sheats,* 247 *Ga.* 713, 279 *S.E.*2d 210, 211 (1981); *Tolmie Farms, Inc. v. J.R. Simplot Co.,* 124 *Idaho* 607, 862 *P.*2d 299, 302 (1993); *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.,* 71 *Ill.App.*3d 562, 28 *Ill.Dec.* 78, 390 *N.E.*2d 60, 64 (1979); *Gaboury v. Ireland Rd. Grace Brethren, Inc.,* 446 *N.E.*2d 1310, 1314 (Ind.1983); *Mays v. Ciba–Geigy Corp.,* 233 *Kan.* 38, 661 *P.*2d 348, 352 (1983); *Lipsteuer v. CSX Transp., Inc.,* 37 *S.W.*3d 732, 735–736 (Ky.2000); *Guenard v. Burke,* 387 *Mass.* 802, 443 *N.E.*2d 892, 898 (1982); *Zip Lube, Inc. v. Coastal Sav. Bank,* 709 *A.*2d 733, 735 (Me.1998); *Gamet v. Jenks,* 38 *Mich.App.* 719, 197 *N.W.*2d 160, 164 (1972); *Hoover v. Norwest Private Mortgage Banking,* 632 *N.W.*2d 534, 541 n. 4 (Minn.2001); *Wright v. State,* 577 *So.*2d 387, 390 (Miss.1991); *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 *S.W.*2d 371, 388 (Mo.1993); *Rivera v. Trujillo,* 128 *N.M.* 106, 990 *P.*2d 219, 221–22 (N.M.Ct.App.), *cert. denied,* 128 *N.M.* 148, 990 *P.*2d 822 (1999);

*Greene v. Osterhoudt,* 251 *A.D.*2d 786, 673 *N.Y.S.*2d 272, 274 (N.Y.App.Div.1998); *Wachovia Mortgage Co. v. Autry–Barker–Spurrier Real Estate, Inc.,* 39 *N.C.App.* 1, 249 *S.E.*2d 727, 732–33 (1978), *aff'd,* 297 *N.C.* 696, 256 *S.E.*2d 688 (1979); *Delzer v. United Bank of Bismarck,* 484 *N.W.*2d 502, 508 (N.D.1992); *Buckeye Federal Sav. and Loan Assoc. v. Cole,* 1986 WL 13274 at \*2 (Ohio Ct.App. Nov. 24, 1986); *Henderson–Rubio v. May Dep't Stores Co.,* 53 *Or.App.* 575, 632 *P.*2d 1289, 1294–95 (1981); *Price v. Becker,* 812 *S.W.*2d 597, 598 (Tenn.Ct.App.), *appeal denied* (Tenn. 1991); *Farroux v. Denny's Restaurants, Inc.,* 962 *S.W.*2d 108, 111 (Tex.Ct.App.1997); *Webster v. Sill,* 675 *P.*2d 1170, 1172–73 (Utah 1983); *Marshall v. AC & S, Inc.,* 56 *Wash.App.* 181, 782 *P.*2d 1107, 1109–10 (1989); *Yahnke v. Carson,* 236 *Wis.*2d 257, 613 *N.W.*2d 102, 108–09 (2000); *Morris v. Smith,* 837 *P.*2d 679, 684–85 (Wyo. 1992); *but see Pittman v. Atlantic Realty Co.,* 359 *Md.* 513, 754 *A.*2d 1030, 1041–42 (2000).

Although the majority of state and federal jurisdictions have adopted some form of the doctrine, it has not been applied mechanistically. See 11 James W. Moore, et al., *Moore's Federal Practice* § 56.14[1][f] at 179 (3d ed. 1997) ("If a party's deposition and affidavit are in conflict, the affidavit is to be disregarded unless a legitimate reason can be given for discrepancies."). The Fifth Circuit Court of Appeals' decision in *Kennett–Murray Corp. v. Bone,* 622 *F.*2d 887 (5th Cir.1980), "provide[s] the leading case for the proposition that the sham affidavit question is acceptable only given certain qualifications." Cox, *supra,* 50 *Duke L.J.* at 284. In *Kennett–Murray,* the court declined to apply *Perma* to reject an affidavit because the court found that the respondent's offsetting affidavit was sufficient to create a material issue of fact notwithstanding its inconsistency with the respondent's prior sworn testimony. *Kennett–Murray, supra,* 622 *F.*2d at 894–95. The case involved a lawsuit brought by the plaintiff employer against a former employee and concerned recovery on a promissory note and employment contract. *Id.* at 889. The employee asserted that he was fraudulently induced to enter into the contract and sign the note. *Ibid.* The district court granted

summary judgment for the plaintiff after disregarding an affidavit submitted by the defendant that supported the allegations of fraud included in his amended answer, which the court conceded "if proven, raise[d] a material fact under Alabama law." *Id.* at 892.

The Fifth Circuit's analysis started with the proposition that a court "cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition" and that "a genuine issue can exist by virtue of a party's affidavit even if it conflicts with earlier testimony in the party's deposition." *Id.* at 893. The court stated that the doctrine established in *Perma* should apply only when an affidavit is "clearly" or "blatantly" inconsistent. *Ibid.*

The court concluded ultimately that summary judgment was inappropriate because the inconsistency that allegedly existed between the defendant's deposition testimony and affidavit was discernable in the deposition testimony itself. Nonetheless, the court continued:

> Even assuming that the deposition was unequivocal, [defendant's] affidavit served to create a genuine issue which would preclude summary judgment. [Defendant's] affidavit did not purport to raise a new matter, but rather to explain certain aspects of his deposition testimony.... A fair reading of the deposition reveals frequent shifts in the questioning between the promissory note and the employment contract with a degree of confusion on the parts of both [defendant] and the attorneys.
>
> The affidavit is not inherently inconsistent with [defendant's] earlier testimony.... Furthermore, the statement in the affidavit is not at odds with [defendant's] general theory of defense presented in the deposition.
>
> [*Id.* at 894–95.]

Thus, the Fifth Circuit's decision in *Kennett–Murray* qualified application of the sham affidavit doctrine by not allowing rejection of an allegedly contradictory affidavit that explained aspects of the affiant's deposition testimony on an unclear point. *See also Franks, supra,* 796 *F.*2d at 1237 (describing factors relevant to determination of "sham fact issue" as whether affiant was cross-examined during deposition, whether affidavit was based on newly discovered information, or whether earlier testimony reflected confusion that later affidavit attempted to explain); *Martin, supra,* 851 *F.*2d at 705 (recognizing that "[w]here the witness was

confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact[,]" but nonetheless affirming summary judgment because no explanation offered for affidavit's contradictions).

Recently, the Wisconsin Supreme Court addressed the use of the sham affidavit doctrine by its trial courts when evaluating motions for summary judgment. *Yahnke, supra,* 613 *N.W.*2d at 104. The court found that the witness' affidavits "obviously contradicted" their depositions and that the "explanation for the contradiction [was] 'unconvincing and, more importantly, not supported by the record.'" *Id.* at 105. Acknowledging that the state and federal civil procedure rules governing summary judgment are nearly identical, the court adopted the reasoning established by many federal circuit courts, noting that the doctrine "is not absolute, and is subject to certain important exceptions." *Id.* at 108. The Wisconsin Court identified several factors to be considered when determining the adequacy of an explanation for an inconsistency, including "whether the earlier deposition testimony reflects confusion, lack of recollection, or other legitimate lack of clarity that the affidavit justifiably attempts to explain." *Id.* at 109. Because the court concluded that in the case before it, the witness' deposition testimony was clear and unambiguous, the affidavits created only a sham factual dispute. The court, therefore, determined that summary judgment was appropriate. *Ibid.*

Uniform standards on the application of the sham affidavit doctrine cannot be found in the case law. The case law that has evolved generally has found that the doctrine, when not applied inflexibly, is useful in the evaluation process that trial courts are called on to perform when deciding a motion for summary judgment. Cox, *supra,* 50 *Duke L.J.* at 284.

The markedly small number of jurisdictions that have rejected use of the doctrine reason that contradictory depositions and affidavits present a credibility question that should not be resolved by the court at the summary judgment stage. *See, e.g., Pittman,*

*supra,* 754 *A.*2d at 1041–42; Cox, *supra,* 50 *Duke L.J.* at 272–75. Those jurisdictions view the rejection of a sham affidavit as an interference with the role of the jury. But that objection, as has been pointed out, is overbroad:

> It seems quite clearly correct to conclude that an interested witness who has given clear answers to unambiguous questions cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, without providing a satisfactory explanation of why the testimony is changed. *If such an explanation is proffered, a credibility question is presented; without it, there are no facts suggesting why a credibility question exists and the nonmoving party should not be allowed to manufacture a question of fact to delay resolution of the suit.* ... [I]f the witness' answers in the deposition are not that clear or the questions are not that unambiguous, a later-filed affidavit may indeed create a genuine issue by supplying additional facts.
>
> [10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2726 (3d ed.1998) (emphasis added).]

## B.

This appeal allows us to consider for the first time the appropriateness of using the sham affidavit doctrine in a summary judgment setting. Our rules of procedure state that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c).

In *Brill v. Guardian Life Insurance Co.,* 142 *N.J.* 520, 666 *A.*2d 146 (1995), we set forth a standard for courts to apply when determining whether a genuine issue of material fact exists that requires a case to proceed to trial. Justice Coleman, writing for the Court, explained that a motion for summary judgment under *Rule* 4:46–2 requires essentially the same analysis as in the case of a directed verdict based on *Rule* 4:37–2(b) or *Rule* 4:40–1, or a judgment notwithstanding the verdict under *Rule* 4:40–2. *Id.* at 535–536, 666 *A.*2d 146. If, after analyzing the evidence in the light most favorable to the non-moving party, the motion court determines that "there exists a single unavoidable resolution of the alleged dispute of fact, that issue should be considered insufficient

to constitute a 'genuine' issue of material fact for purposes of *Rule* 4:46–2." *Id.* at 540, 666 *A.*2d 146 (citation omitted). Foreshadowing the question that we now address, Justice Coleman explained why a properly decided summary judgment motion does not "denigrate the role of the jury:"

> Of course there is in this process a kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials. This process, however, is not the same kind of weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence. On a motion for summary judgment the court must grant all the favorable inferences to the non-movant. But the ultimate factfinder may pick and choose inferences from the evidence to the extent that "a miscarriage of justice under the law is not created." *R.* 4:49–1(a).

> . . . .

> Measured by that standard, a dismissal ... does not unduly intrude on the province of the jury. In those instances there simply is no issue to be decided by a jury based on the evidence. A jury decides factual, not legal, disputes. If a case involves no material factual disputes, the court disposes of it as a matter of law by rendering judgment in favor of the moving party on the issue of liability or damages or both.

> [*Id.* at 536–37, 666 *A.*2d 146.]

The decision in *Brill* acknowledged the tension between allowing parties the opportunity to "fully expose [their] case" and protecting potential defendants from meritless claims. *Id.* at 541–542, 666 *A.*2d 146 (quoting *Robbins v. Jersey City,* 23 *N.J.* 229, 240, 128 *A.*2d 673 (1957)). *Brill* sought to aid courts in applying the summary judgment standard and to "encourage" its use in appropriate cases: "The thrust of today's decision is to encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves." *Brill, supra,* 142 *N.J.* at 541, 666 *A.*2d 146. Shortly after the *Brill* decision, *Rule* 4:46–2 was supplemented with additional explanatory language: "[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." *R.* 4:46–2(c).

The very object of the summary judgment procedure then is to separate real issues from issues about which there is no

serious dispute. Sham facts should not subject a defendant to the burden of a trial. The determination that an offsetting affidavit creates only a sham factual dispute is squarely within the trial court's authority at the summary judgment stage, when the court is required to evaluate, analyze, and sift evidence to determine whether the evidential materials, when viewed in the light most favorable to the opposing party, would permit a rational factfinder to resolve the issue in favor of the opposing party. See *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146. That rule does not intrude on the function of the jury because it does not require the trial court to determine credibility, or to determine the relative weight of conflicting evidence. We are confident that trial courts have the ability to distinguish sham affidavits from affidavits that raise a genuine issue of material fact. See Cox, *supra,* 50 *Duke L.J.* at 284; *see also,* James Joseph Duane, *The Four Greatest Myths about Summary Judgment,* 52 *Wash & Lee L.Rev.* 1523, 1595–1611 (1995) (arguing that trial court can determine whether offsetting affidavits justify granting summary without impinging on role of jury).

▪ Accordingly, the sham affidavit doctrine calls for the trial court to perform an evaluative function that is consistent with our holding in *Brill.* When not applied mechanistically to reject any and all affidavits that contain a contradiction to earlier deposition testimony, the doctrine requires a court to evaluate whether a true issue of material fact remains in the case notwithstanding an affiant's earlier deposition testimony. The Appellate Division has applied the doctrine in the past, as do we for the first time here. See *Shelcusky, supra,* 343 *N.J.Super.* at 510, 778 *A.*2d 1176; *Moisor v. Ins. Co. of N. Am.,* 193 *N.J.Super.* 190, 195, 473 *A.*2d 86 (App.Div.1984). Critical to its appropriate use are its limitations. Courts should not reject alleged sham affidavits where the contradiction is reasonably explained, where an affidavit does not contradict patently and sharply the earlier deposition testimony, or where confusion or lack of clarity existed at the time of the

deposition questioning and the affidavit reasonably clarifies the affiant's earlier statement.

## III.

■  Applying those principles we have concluded that the grant of summary judgment in this case was inappropriate for two reasons: a rational factfinder could determine that (1) plaintiff's deposition testimony and initial certification were not inconsistent with his subsequent certification; and (2) plaintiff had a plausible explanation for any perceived inconsistency in his representations to the court.

A comparison of plaintiff's deposition and initial certification with his second certification reveals that this is not a case where a party has "flatly contradicted" his prior sworn testimony. See *Martin, supra,* 851 *F.*2d at 705. All three documents indicate that plaintiff was completely unaware of what was in the boxes he was loading at the time of his accident. Plaintiff's statement in his second certification that "I knew prior to my accident that the rejected and leaking aerosol cans I was loading were flammable" does not contradict that assertion. When read in conjunction with his subsequent statement that a warning "would have caused me to inspect what I was loading[,]" it becomes clear that the statement was meant to convey that, even though plaintiff did not know specifically what was in the boxes of cans he was loading at the time of the accident, he knew in general that damaged, leaking aerosol cans were flammable. Upon inspection, he would have realized that the rejected cans he was loading were flammable. The statements are not "inherently irreconcilable," and do not implicate the sham affidavit doctrine. See *Tippens v. Celotex Corp.,* 805 *F.*2d 949, 954 (11th Cir.1986) (finding that affidavit stating that affiant could generally remember occurrence of certain events did not contradict prior deposition testimony where affiant was unable to recall *specific* occurrences of same events).

Cases granting summary judgment based on inconsistent affidavits generally have involved clear contradictions unlike those

presented in this case. *See, e.g., Mosior, supra,* 193 *N.J.Super.* at 194, 473 *A.*2d 86 (involving contradictory dates relating to insurance policy coverage); *Martin, supra,* 851 *F.*2d at 705 (concerning contradictory dates relating to ingestion of allegedly defective product); *Hackman v. Valley Fair,* 932 *F.*2d 239, 241 (3rd Cir. 1991) (regarding contradictory dates relating to relevant statute of limitations); *Webster, supra,* 675 *P.*2d at 1172 (concerning directly contradictory statements regarding alleged dangerous condition). The allegedly inconsistent statements made by plaintiff in this case are different in kind from those cases. Moreover, although plaintiff's earlier representations do not refer specifically to his knowledge that leaking aerosol cans are flammable, he never spoke to the contrary. During his deposition he was asked only whether he knew there were flammable materials on the premises, not whether he knew specifically that leaking aerosol cans were flammable.

Plaintiff's argument is bolstered by the fact that other portions of his statements and allegations are consistent with each other. All three statements indicate that he was completely unaware that he was loading leaking aerosol cans at the time of the accident. All three indicate that plaintiff did not see any warning on the forklift alerting him that it should not be used to transport flammable materials. Both of his certifications assert that a warning would have prompted him to change his course of conduct regardless of whether his employer had informed him that the leaking cans were flammable. Furthermore, in support of his first motion for reconsideration, plaintiff submitted a certification from his co-worker stating that he also knew that the types of products manufactured at R & C contained isobutane and were flammable. That certification supported plaintiff's contention that even though R & C did not consider leaking, rejected cans to be flammable, he and other employees knew the cans contained flammable ingredients. Moreover, his co-worker's statements are consistent with the statements plaintiff made in his second certification.

Plaintiff also has a plausible explanation for any inconsistency in his representations. See David J. Lender, *Motions for Summary Judgment Under Rule 56: Strategy and Tactics, in Federal Pretrial Practice: Basic Procedure & Strategy 2001* at 312 (PLI Litig. & Admin. Practice Course Handbook Series No. H0-00CG, 2001) (noting that "summary judgment may be avoided if there is a good faith explanation" for inconsistent affidavit). The two most frequently cited acceptable explanations for contradictory affidavits are (1) apparent confusion or lack of clarity during the deposition; and (2) the affiant has obtained new evidence. See Cox, *supra,* 50 *Duke L.J.* at 287–88.

■ Plaintiff's second certification sought to clarify his previous representations, which may have suggested that he knew generally only that flammable materials existed at the R & C facility, whereas in reality he knew specifically that leaking aerosol cans were flammable. See *Kennett–Murray, supra,* 622 *F.*2d at 894 (finding plaintiff's affidavit sought to "explain certain aspects of his deposition testimony"). Plaintiff's clarifying affidavit was sufficient to create a genuine issue regarding proximate causation. As explained by the court in *Kennett–Murray:* "Certainly every discrepancy contained in an affidavit does not justify a [trial] court's refusal to give credence to such evidence." *Ibid.; see also Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 990 *F.*2d 342, 345–46 (7th Cir.1993) (finding affidavit of nurse in negligence case to be clarifying, not contradictory; when deposed, nurse stated she did not use or look for certain device on medical apparatus and affidavit explained that she did not look for device because she had used same apparatus previously and knew it did not contain device).

Plaintiff worked at R & C for sixteen years. His representations to the court reflect cumulatively his awareness that the materials he worked with on a daily basis were flammable. Contrary to the view of our dissenting colleague, the record is not so one-sided on the question of proximate cause that summary judgment should be granted. A jury reasonably could find that he

would not have used the forklift on the day of the accident if defendant had supplied an adequate warning. Plaintiff raised a genuine issue of material fact and, therefore, the grant of summary judgment to defendant was in error.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for further proceedings.

VERNIERO, J., concurring in part, dissenting in part.

The Court holds that summary judgment should not have been granted based largely on its determination that plaintiff's second certification was not a sham affidavit. I concur in that portion of the Court's opinion incorporating the sham-affidavit doctrine into our jurisprudence. In my view, however, the proper inquiry is not whether plaintiff submitted a sham affidavit. Rather, it is whether the existing pleadings, depositions, and certifications create a jury question in respect of whether the lack of a warning on the forklift was the proximate cause of plaintiff's injuries. Because no reasonable jury could find proximate causation on the record presented, I respectfully dissent from the majority's ultimate disposition.

"There is no question that warnings necessary to make a product reasonably safe, suitable and fit for its intended use must be placed on the product." *Vallillo v. Muskin Corp.*, 212 *N.J.Super.* 155, 159, 514 *A.*2d 528 (App.Div.1986). Consistent with that statement, this Court has acknowledged that the failure to provide necessary warnings constitutes a breach of a duty for which the manufacturer may be held liable. *Coffman v. Keene Corp.*, 133 *N.J.* 581, 598, 628 *A.*2d 710 (1993). To reinforce that duty, the Court applies a "heeding presumption" in failure to warn cases that presumes that the plaintiff would have "heeded" or followed a warning had the manufacturer provided one. *Id.* at 595, 628 *A.*2d 710.

However, the absence or inadequacy of a necessary warning does not end the inquiry. "[W]hen we focus not upon the acknowledged duty of the manufacturer to warn ... but rather upon the effect of the warning ... our analysis must shift to an assessment of the breach of that duty as a proximate cause of the accident." *Vallillo, supra,* 212 *N.J.Super.* at 159, 514 *A.*2d 528. As a result, in failure to warn cases, the plaintiff must still prove that the insufficiency of the warning was a proximate cause of the accident. *Molino v. B.F. Goodrich Co.,* 261 *N.J.Super.* 85, 99, 617 *A.*2d 1235 (App.Div.1992).

In the alternative, a manufacturer may overcome the heeding presumption by proving that either the plaintiff would have disregarded the warning, or that the employer would have ignored the warning by failing to take reasonable precautions to ensure employee safety and would not have permitted its employees to avoid the harm. *Coffman, supra,* 133 *N.J.* at 609, 628 *A.*2d 710. Regardless of how the issue is addressed, "proof of proximate causation [is required] in failure to warn cases where the plaintiff [is] unaware of the danger." *Graves v. Church & Dwight Co.,* 267 *N.J.Super.* 445, 457, 631 *A.*2d 1248 (App.Div.1993).

Ordinarily, the jury considers issues of proximate cause. *Perez v. Wyeth Labs., Inc.,* 161 *N.J.* 1, 27, 734 *A.*2d 1245 (1999). That rule, however, is far from absolute. The *Restatement (Second) of Torts* § 435(2) instructs that courts may resolve for themselves the question of legal or proximate causation if they conclude that no reasonable jury could find such causation on the record presented. Our case law is in accord with that well-established principle. *See, e.g., Vega by Muniz v. Piedilato,* 154 *N.J.* 496, 509, 713 *A.*2d 442 (1998) (invoking court's authority to dismiss plaintiff's case on causation grounds); *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 78–79, 222 *A.*2d 513 (1966) (discussing applicable case law).

Additionally, on a motion for summary judgment, we are required to view the evidence in a light most favorable to the nonmoving party. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.*

520, 540, 666 A.2d 146 (1995); *R.* 4:46–2(c). However, "an adverse party may not rest upon the mere allegations or denials of the pleading . . . [to show] that there is a genuine issue for trial." *R.* 4:46–5(a). Further, " '[b]are conclusions in the pleadings without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment.' " *Brae Asset Fund, L.P. v. Newman,* 327 *N.J.Super.* 129, 134, 742 A.2d 986 (App.Div.1999) (alteration in original) (quoting *United States Pipe & Foundry Co. v. Am. Arbitration Ass'n,* 67 *N.J.Super.* 384, 399–400, 170 A.2d 505 (App.Div.1961)).

In applying those tenets, I agree with the trial court and Appellate Division that plaintiff cannot prove that the absence of a warning in this case was a proximate cause of his injuries. In testimony prior to his second certification, plaintiff gave no indication that he believed that the finished aerosol cans that he was loading were explosive. That testimony is consistent with the record, which shows that neither R & C's management team nor its employees ever considered those products to be flammable.

When questioned regarding the handling of rejected aerosol cans, one of R & C's managers explained that the company "had no knowledge that handling [the materials] with other than an E rated truck was a problem." Further, OSHA's 1996 investigation of the accident revealed that "[a]ll [employees] interviewed stated, they did not consider the product a hazard. They thought because it was a finished product, it was safe, even if the containers were leaking." The OSHA report also concludes that R & C's training programs were deficient because they failed to alert employees to the hazards associated with handling leaking aerosol cans.

The certification submitted by plaintiff's co-worker, David Lambert, in support of plaintiff's first motion for reconsideration does not contradict those findings. The co-worker states only that he was aware that some of the materials used in the workplace were flammable. His statement does not indicate that he ever believed that the finished products (even those that leaked) were combusti-

ble. As the trial court correctly observed, for purposes of causation, there is a difference between knowing that "there were explosive gasses on the premises" and knowing that "the aerosol cans [being] loaded at the time of [plaintiff's] accident were flammable."

Given those undisputed facts, even if the forklift used by plaintiff bore the suggested warning, the accident would not have been prevented. Plaintiff states that a warning would have led him to inspect the contents of the boxes he was loading to ensure that they were not flammable. However, in opening the boxes, plaintiff would have seen only that they contained finished aerosol cans. Thus, a warning to forklift users that they should not load flammable products would have gone unheeded, because, as found by OSHA, no one interviewed by that agency believed that the finished aerosol products were flammable.

Plaintiff's second certification, in which he states that he "knew that the rejected and leaking aerosol cans [he] was loading were flammable," reflects a bare assertion that finds no support in the record. Indeed, the balance of the record refutes it. Neither R & C's management nor plaintiff's co-workers considered the finished cans flammable. Further, plaintiff's hazardous materials training did not address the potential dangers of leaking aerosol cans. Finally, as noted, the certification of Lambert at best reveals that he believed that some of the raw materials used in processing the cans were flammable; it does not demonstrate that he thought the finished product was dangerous, a critical distinction for purposes of causation.

This is a sad and tragic case. It will not be helped by asking a jury to resolve a question that, in my view, lends itself to only one reasonable answer. The record clearly demonstrates that misinformation in the workplace regarding the flammable nature of the cans, not Crown's failure to affix a warning to its forklifts, was the cause of the accident. As a result, plaintiff cannot establish that a genuine issue of material fact exists in respect of proximate

causation. For that reason, summary judgment is the appropriate disposition, and I would affirm the judgment below.

*For reversing and remanding*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA, and ZAZZALI—6.

*For affirming*—Justice VERNIERO—1.