885 A.2d 955

PATRICIA KENNELLY–MURRAY AND RICHARD MURRAY, PLAINTIFFS–APPELLANTS, v. EDWARD C. MEGILL, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 24, 2005—Decided November 17, 2005.

304

Before Judges ALLEY, C.S. FISHER and YANNOTTI.[1]

*Eugene Cross* argued the cause for appellants (*Ramp & Renaud*, attorneys; *Ann L. Renaud*, of counsel and on the brief).

---

[1] Judge Yannotti did not participate in oral argument. However, the parties have consented to his participation in the decision.

*Kenneth A. Seltzer* argued the cause for respondent (*Law Offices of Stephen E. Gertler,* attorneys; *Mr. Seltzer,* on the brief).

The opinion of the court was delivered by

FISHER, J.A.D.

In this verbal threshold matter, we hold, among other things, that by narrowing one of the bodily injury categories contained in the Automobile Insurance Cost Reduction Act of 1988 (AICRA), *N.J.S.A.* 39:6A–8—that is, by replacing the pre-existing "fractures" category with a "displaced fractures" category—the Legislature did not intend to bar claims based upon only "non-displaced fractures." Instead, we conclude that the Legislature intended to relegate such a claim to AICRA's catch-all category that requires proof of "a permanent injury within a reasonable degree of medical probability." As a result, we reverse in part the summary judgment entered in defendant's favor.

Plaintiff Patricia Kennelly–Murray (plaintiff), and her husband,[2] filed a complaint seeking personal injury damages resulting from a January 18, 2002 auto accident allegedly caused by defendant. Specifically, plaintiff asserted that she suffered non-displaced fractures of eight ribs, her sternum, and the tibial plateau of her left leg. Plaintiff also claimed that the auto accident caused a laceration to her nose that would not heal; upon further examination, a basal cell carcinoma was there located and later surgically removed, leaving what plaintiff claims to be a significant and disfiguring scar.

In moving for summary judgment, defendant asserted that plaintiff's proofs failed to meet the requirements of AICRA's verbal threshold. In this regard, defendant chiefly relied upon *James v. Torres,* 354 *N.J.Super.* 586, 808 *A.*2d 873 (App.Div.2002), *certif. denied,* 175 *N.J.* 547, 816 *A.*2d 1049 (2003), which held that *Oswin's*[3] serious impact prong was subsumed within AICRA. The

---

[2] Plaintiff's husband asserted a per quod claim.

[3] *Oswin v. Shaw,* 129 *N.J.* 290, 609 *A.*2d 415 (1992).

judge—as then obligated—followed *James* and determined, in considering the serious impact proofs, that plaintiff had submitted a sham certification, which he chose not to consider. The judge also found, as a matter of law, that the auto accident was not the proximate cause of the scar on plaintiff's nose.

Plaintiff appealed, arguing that (1) the judge erred by applying *Oswin's* serious impact test, as well as the "sham affidavit doctrine," in granting summary judgment, (2) there was a genuine dispute about whether the accident caused the nose scar, and (3) non-displaced fractures are sufficient to vault the verbal threshold when it can be shown that such injuries are permanent.

I

In her appeal, plaintiff argues that the judge's determination that the proofs did not suggest a serious impact upon her life was irrelevant. Plaintiff's contention is correct since, during the pendency of this appeal, the Supreme Court overruled our holding in *James. See DiProspero v. Penn,* 183 *N.J.* 477, 506, 874 *A.*2d 1039 (2005); *Serrano v. Serrano,* 183 *N.J.* 508, 509, 874 *A.*2d 1058 (2005). As a result, it might appear that our further consideration of the judge's ruling on the serious impact prong has been rendered unnecessary. However, plaintiff seeks a ruling regarding the application of the sham affidavit doctrine because of her concern for its potential impact on her credibility at trial. We agree that the point warrants some further discussion.

In *Shelcusky v. Garjulio,* 172 *N.J.* 185, 201, 797 *A.*2d 138 (2002), the Supreme Court endorsed the sham affidavit doctrine so long as the judge "perform[s] an evaluative function that is consistent with" *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 666 *A.*2d 146 (1995). That is, the doctrine is not to be applied mechanically when a conflict appears between what has been presented in opposition to summary judgment and what was stated at an earlier deposition. In analyzing the sham affidavit doctrine's parameters, the Court admonished judges not to reject what is alleged to be a sham affidavit "where the contradiction is

308

reasonably explained, where an affidavit does not contradict patently and sharply the earlier deposition testimony, or where confusion or lack of clarity existed at the time of the deposition questioning and the affidavit reasonably clarifies the affiant's earlier statement." *Shelcusky, supra,* 172 *N.J.* at 201–02, 797 *A.*2d 138.

Prior to the filing of his motion for summary judgment, defense counsel deposed plaintiff and asked about her present physical complaints. Plaintiff testified that her chest ached once or twice a day, prompting defense counsel to ask whether that occasional pain "prevent[ed] [her] from doing any activities that [she] used to do." Plaintiff said, "No." Upon further questioning, plaintiff revealed that her left knee continued to ache. Counsel asked whether this aching prevented her from performing any of her prior activities, and plaintiff said, "No." Following this, a more generic question was posed and answer given:

Q.... Are there any activities that you can no longer perform that you used to perform prior to the accident because of the injuries you sustained in the accident?
A. No.

Later in the deposition, plaintiff explained her view of the accident's psychological impact, and how she was prescribed tranquilizers to relieve anxiety and nightmares. When asked by defense counsel whether this medication helped, plaintiff said it did, and did not indicate that these or any similar problems had continued.

Defense counsel then asked a few general, open-ended questions directed at the heart of the serious impact prong:

Q. Are there any other ways in which you feel the accident or the injuries you sustained in the accident have now impacted upon your life at the present time?
A. I don't know how to answer that.
Q. Do you understand the question?
A. I understand the question, but I'm trying to think of the best way to answer you. I think any accident of any magnitude changes people, forces them to look at things differently. Just as a result of the tremendous pain that one feels, you are changed.
Q. How about physically. I understand what you just said to me, but in a physical sense. Do you feel presently a serious impact on your life?

A. No.

It was also established during the deposition that plaintiff was not employed at the time of the accident and that plaintiff had resumed doing the things around the house which, for a period of months after the accident, plaintiff's husband performed in her stead.

After this examination, plaintiff's counsel asked questions about the pain plaintiff alleged she continued to feel as a result of the accident. Plaintiff's counsel, however, made no attempt to coax from plaintiff any testimony to rebut her earlier denials of a serious impact upon her life.

Defendant thereafter moved for summary judgment, principally asserting the absence of evidence that would support *Oswin's* now-defunct serious impact test. Despite the denial of a serious impact on her life at her deposition, plaintiff filed a certification in response to defendant's motion for summary judgment in which she asserted:

5. I have healed over time with some degree of success. I have been left with daily pain that affects my left side and my left knee. In regard to the left side, I have been left with significant tenderness in that area. *It is impossible for me to turn in the night and to lie on my side.* Because of this, I find that I am awakened every night as I move in my sleep. Once I am awake, it is difficult for me to return to sleep so that *I have not had a complete night's sleep since this accident. That leaves me tired the next day.*

6. In regard to the pain in my knee, it is daily. When I get up in the morning I am stiff and in quite a bit of pain. This gets better as I force myself to move around during the day. The cyclical pattern is that as the day wears on and I have been up and about gradually the pain and fatigue in my knee worsens so that by the end of every day I am in considerable pain. *I have to be careful of the level of walking I do* because I find that walking makes this pain occur much more quickly in the course of the day. This creates a problem for me as I suffer from COPD (Chronic obstructive pulmonary disorder) and walking is prescribed to keep my lungs as full as possible. Before the accident I had been working very hard to increase my walking capacity. I walked every day that the weather permitted. *My average walking distance was about sixteen blocks, but I had on occasion gotten up to twenty-two blocks. After the accident I could not walk at all. Now that I have healed I have resumed my walking but it is now significantly limited by my pain. At the present time I can only do about four to six blocks before the pain keeps me from continuing.*

7. Because of the pain and tenderness in my side, I have been unable to tolerate being hugged, even lightly. This means that *I have not been able to be hugged by my husband, my adult children, or my grand-children since this accident.*

8. Because I am relatively recently re-married to a man eleven years younger than me, I have been very lucky to still enjoy an active sexual life. For the first six months following the accident I was unable to engage in sex at all. *At the present time I am limited by pain and feel that my sexual activity has decreased by about one-third.*

. . . .

10. In an attempt to be as honest as I possibly could about the long-term effects of this accident, I have testified in deposition, and repeat here, that there are really no activities I could do before the accident that I cannot do now. I would like to explain that because of my long-term battle with asthma and COPD, I have always had to curb my physical activities in more recent years. Therefore, since I have always been a reader and more recently engaged in less strenuous activities, I have not been completely unable to do the things I was doing at the time of the accident. However, *I have been limited in my ability to walk to the degree that has been prescribed and have foregone the other activities as described above.*

[Emphasis added.]

■ A considerable platform for the judge's finding that this certification breached the sham affidavit doctrine can be constructed from the stark differences in its and the deposition's content, and also by plaintiff's failure to assert in her certification that she was confused at her deposition. However, we need not resolve the parties' arguments about this precise point and instead only briefly explain the scope of the sham affidavit doctrine.

■ A finding that a sham affidavit was filed in opposition to a summary judgment motion does not require that, when the matter eventually goes to trial, the jury should be instructed that the affiant is not worthy of belief. And a finding that a party has not violated the sham affidavit doctrine does not preclude the use of the sworn contradictions at trial in order to challenge the affiant's credibility. The sham affidavit doctrine is a device applicable only to the summary judgment procedure, and whether it has been previously found applicable, or not, has no binding effect beyond the ruling on the summary judgment motion. Since the judge's invocation of the sham affidavit doctrine here related only

to the now-defunct serious impact prong, the finding that plaintiff submitted a sham certification that could have no weight in the summary judgment process has become irrelevant, but we emphasize, also, that the use to which defendant may put either the certification or the deposition testimony, or both, at trial remains unaffected.

## II

The parties also contested whether the scar on plaintiff's nose constituted the type of injury that could vault the verbal threshold's requirement that a scar must be significant and disfiguring. *N.J.S.A.* 39:6A–8. However, rather than rule upon that precise point, the judge instead thoroughly reviewed the evidence and determined

> there's nothing to indicate that this accident caused this cancer. I find that [the scar is] a result of the cancer surgery and certainly there's nothing to indicate that this accident caused this cancer. No question it didn't cause this cancer. Cancer is not caused by trauma. And certainly no doctor is going to say it was.

In arguing that the judge's ruling was mistaken, plaintiff has attempted to liken this case to *Mancuso v. Mancuso,* 209 *N.J.Super.* 51, 506 *A.*2d 1253 (App.Div.1986), asserting in her brief that "while the accident was not the cause of the cancer, *the trauma caused by the motor vehicle accident contributed to the cancer* and ultimately resulted in the scarring" (emphasis added). *Mancuso,* however, has no bearing on the present matter.[4] More importantly, we observe that the record does not reveal that plaintiff has named an expert willing or able to opine that the motor vehicle accident "contributed to the cancer," as is baldly asserted in her brief. Since the existence of a nexus between the accident and plaintiff's cancer is not something that can be based upon common knowledge, we agree with the judge that plaintiff failed to provide sufficient evidence to support the contention that

---

[4] *Mancuso* considered an application of the discovery rule to avoid the statute of limitations on a claim that an auto accident that occurred more than two years prior to the filing of a complaint triggered Parkinson's disease.

the cancerous condition, and the scar resulting from its removal, were proximately caused by the accident.

### III

That leaves for our consideration the question of whether plaintiff presented evidence of an injury meeting the requirements of the verbal threshold. Plaintiff's expert stated that the accident proximately caused eight rib fractures, a fractured sternum, and a fractured tibial plateau. It appears to be undisputed that all these fractures were non-displaced.

In considering how the Legislature currently views non-displaced fractures in this setting, we initially observe that AICRA "reconfigured" the verbal threshold's prior nine categories into six. *DiProspero, supra,* 183 *N.J.* at 488, 874 *A.*2d 1039. Claims for pain and suffering are now barred unless the plaintiff has incurred a bodily injury that resulted in (1) "death," (2) "dismemberment," (3) "significant disfigurement or significant scarring," (4) "displaced fractures," (5) "loss of a fetus," or (6) "a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." *N.J.S.A.* 39:6A–8. Noteworthy is the fact that the Legislature replaced a category that declared any "fracture" to be an injury sufficient to vault the verbal threshold with a narrower category that so designates only "displaced fractures." The question that this statutory amendment suggests is whether the Legislature meant to preclude claims based upon non-displaced fractures even when the injury is permanent, or whether the Legislature meant merely to relegate such a claim based upon a non-displaced fracture to a category (6) analysis.

In analyzing this question, we observe that with the exception of category (4), all the statute's categories delineate injuries that are inherently permanent, i.e., death, dismemberment, loss of a fetus, disfiguring scars. Unlike these others, category (4) requires only proof that the fracture was displaced, thus rendering eligible a displaced fracture even when it does not result in permanency.

*See DiProspero, supra,* 183 *N.J.* at 497, 874 *A.*2d 1039 ("Only a displaced fracture could possibly qualify as a non-permanent injury, provided the fracture could heal well enough for the bone to function normally.").

While it is perhaps arguable that, in reconstituting the verbal threshold categories, the Legislature intended to preclude as a sufficient injury *any* non-displaced fracture, we believe that the Legislature's intent was only to subject non-displaced fractures to a category (6) analysis. In other words, we conclude that AICRA literally permits any displaced fracture, even when not resulting in a permanent injury, to satisfy category (4), but did not mean to shut the door on all non-displaced fractures. Instead, AICRA permits a non-displaced fracture to vault the verbal threshold but only if it meets the requirements of category (6), as we stated in dictum in *Villanueva v. Lesack,* 366 *N.J.Super.* 564, 569, 841 *A.*2d 954 (App.Div.2004).

■ While the question may be open to legitimate debate, we are persuaded by the Supreme Court's own recent literal interpretation of *N.J.S.A.* 39:6A–8. *See, e.g., Serrano, supra,* 183 *N.J.* at 515, 874 *A.*2d 1058 ("In *DiProspero, supra,* we declined to graft *Oswin's* standard onto AICRA's threshold. We recognized that, generally, the plain language of a clearly written statute is the best indicator of legislative intent."). In following that approach, we find no evidence in either the language of the statute or, for that matter, in its legislative history to suggest that, by restricting the "fracture" category, the Legislature intended to bar claims based upon non-displaced fractures, even when resulting in permanent injuries. Indeed, our holding that only displaced fractures are encapsulated by category (4) and that claims of non-displaced fractures must result in a permanent injury also comports with the legislative intent to further occlude rather than expand the pipeline of claims that may pass through the verbal threshold because now a non-displaced fracture is no longer automatically sufficient but must be shown to be permanent within the meaning of category (6).

In so viewing the current version of *N.J.S.A.* 39:6A–8, we conclude that the record on appeal presents a disputed question of fact as to whether any of plaintiff's non-displaced fractures meet the permanency requirement of category (6). In fact, defendant concedes there is a genuine dispute about the presence of a permanent injury. Accordingly, insofar as it was based on the verbal threshold, we conclude that the summary judgment entered in favor of defendant must be reversed.

In summary, we affirm that part of the summary judgment that dismissed plaintiff's claim insofar as it sought damages for the scar on her nose, but otherwise reverse the summary judgment and remand for further proceedings in conformity with this opinion. We do not retain jurisdiction.