# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2621-16T4

J.M.,

     Plaintiff-Respondent,

v.

T.F.,

     Defendant-Appellant.

_____

Argued November 8, 2018 – Decided January 17, 2019

Before Judges Fuentes, Vernoia and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-2253-16.

Philip Nettl argued the cause for appellant (Benedict and Altman, attorneys; Philip Nettl, on the briefs).

Joseph DiRienzo argued the cause for respondent (DiRienzo & DiRienzo PA, attorneys; Joseph DiRienzo, on the briefs).

PER CURIAM

Defendant T.F. appeals from a February 3, 2017 final restraining order (FRO) entered in favor of plaintiff J.M. pursuant to the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35. We reverse.[1]

## I.

Plaintiff and defendant are the parents of a daughter who was eight years old at the time of the incident which gave rise to the FRO. Defendant was the child's parent of primary residence, and plaintiff enjoyed regular parenting time with the child.

On May 24, 2016, defendant sent plaintiff a text message asking whether he "prefer[red] sugar in [his] coffee or plain black" and stating their daughter wanted to show plaintiff a "tee and net" in defendant's backyard when plaintiff arrived the following day to pick her up for his scheduled parenting time. Plaintiff was surprised by the message and offer of coffee because for many years defendant had not provided refreshments when he picked up the child for

---

[1] The FRO required that defendant pay plaintiff's attorney's fees "incurred for this matter" but did not specify the amount. On March 7, 2017, the court entered an order of judgment against defendant in the amount of $49,542 for plaintiff's attorney's fees. Defendant's notice of appeal does not list the March 7, 2017 order and, therefore, defendant does not appeal from that order. However, because we reverse the entry of the FRO which directed the payment of attorney's fees in the first instance, we also reverse the March 7, 2017 order of judgment.

A-2621-16T4

his parenting time, and plaintiff's and defendant's interactions concerning parenting time had been contentious on occasion. Plaintiff's surprise at the offer is reflected in the text message he sent in response: "Try again. I think you got the wrong person."

The following day, May 25, 2016, was eventful. Plaintiff usually picked up his daughter at defendant's parents' home, but received a text message from defendant advising the child was at her home. When plaintiff arrived at 5:00 p.m., defendant and the child were on the porch. Defendant had a cup of coffee waiting for plaintiff. The parties' daughter poured sugar from a box into plaintiff's cup. Plaintiff, defendant, and the child then went to the backyard where plaintiff and the child played catch and defendant attempted to construct a pitch-back net. Shortly after plaintiff finished drinking the coffee, his speech became slurred. He then became incapacitated and nonresponsive.

Defendant unsuccessfully attempted to call her father, a physician, and then called 9-1-1. Emergency medical personnel arrived and transported plaintiff to the emergency room at J.F.K. Medical Center, where he arrived comatose and in critical condition.

His treating physician's initial diagnoses included a "[p]ossible seizure at the time of presentation," "[r]espiratory failure," "[b]enzodiazepine, positive

urine drug screen," and that plaintiff's "[a]ltered mental status [was] of unknown etiology," meaning the cause of his condition was unknown.[2] When plaintiff was discharged from the hospital six days later, his treating physician's discharge diagnoses were "[a]ltered mental status" and "[r]espiratory failure of unknown etiology."

Twenty days after he left the hospital, plaintiff filed a June 20, 2016 complaint seeking a temporary restraining order against defendant under the PDVA. The complaint alleged defendant committed the predicate act of assault, N.J.S.A. 2C:25-19(a)(2), and asserted defendant gave plaintiff a cup of coffee on May 25, 2016, plaintiff woke up at a hospital several days later, and doctors told plaintiff they found a substance in his "blood stream." Plaintiff later alleged more specifically that defendant assaulted him by putting benzodiazepine in the coffee and that the benzodiazepine caused his coma and life-threatening medical conditions. The court entered a June 20, 2016 domestic violence temporary restraining order against defendant. Defendant was also charged criminally with

---

[2] Plaintiff's treating physician did not testify at trial. He prepared a discharge summary that was admitted in evidence and details plaintiff's "admitting diagnoses" and "discharge diagnoses." "Etiology" means "cause [or] origin[,] specifically: the cause of a disease or abnormal condition." Etiology, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/etiology (last visited Jan. 2, 2019).

offenses, including attempted murder, based on the allegation that she put benzodiazepine in plaintiff's coffee and caused his medical condition.

The trial on plaintiff's request for an FRO took place over eleven days, and primarily turned on the issue of causation: that is, did benzodiazepine cause plaintiff's critical medical condition. Plaintiff claimed his condition was caused by benzodiazepine and that, based on the totality of the circumstances, it could be reasonably inferred defendant assaulted him by placing benzodiazepine in the coffee she gave him.

Plaintiff first called defendant as a witness. Defendant asserted her Fifth Amendment right to remain silent and refused to testify.[3] Her counsel argued

---

[3]  Defendant filed a motion to supplement the record on appeal with an order dismissing the criminal charges against defendant arising out of the alleged incident with plaintiff and the transcript of the May 18, 2018 Criminal Division proceeding during which the charges were dismissed. The transcript shows the State requested dismissal of the criminal charges because its expert could not "opine beyond a reasonable doubt that [plaintiff's medical condition] was the result of benzodiazepine poisoning . . . as opposed to . . . an underlying medical condition." We granted the motion to supplement the record on appeal with the caveat that "[t]he Merits Panel shall decide whether the supplemental documents shall be considered." We have reviewed the transcript and order and conclude they are irrelevant to our determination of whether the Family Part correctly found plaintiff presented sufficient evidence supporting the issuance of the FRO under the PDVA. We consider the transcript and order only to the extent they provide confirmation that, at the time of the Family Part trial, defendant was charged with attempted murder and five other offenses in connection with the incident involving plaintiff. We otherwise decide the merits of the case based solely on the Family Part record.

the court should not draw any negative inference based on her assertion of her Fifth Amendment rights. The judge observed that plaintiff had not argued a negative inference should be drawn and said defendant's counsel should not "make [the argument] for" plaintiff. Plaintiff's counsel did not request that the court draw a negative inference based on defendant's refusal to testify. Instead, he asserted that defendant's reliance on the Fifth Amendment right to remain silent did not support her refusal to testify because testimony in the FRO hearing could not be used "in a criminal proceeding or in any other proceeding." The court rejected the argument, finding out of "an abundance of caution" that defendant could properly refuse to testify.

Plaintiff testified and generally explained his interactions with defendant concerning parenting time issues prior to May 25, 2016. He described his exchange of text messages with defendant on May 24, 2016, and what occurred when he went to defendant's home on May 25, 2016. He recalled defendant holding the cup of coffee when he arrived, the child pouring what he understood was sugar into the coffee, going into the back yard, drinking the coffee and feeling incapacitated. He next remembered waking up in the hospital three days later. He testified he did not eat or drink anything unusual on May 25, 2016,

A-2621-16T4

and had not taken medications or drugs of any kind on that day or the days preceding it.

Plaintiff also called Dr. Kamalakar Vanam as a witness. He is the emergency room doctor who cared for plaintiff from shortly after 6:00 p.m. on May 25, 2016, when plaintiff arrived at the hospital, until Dr. Vanam's shift ended eight hours later at approximately 2:00 a.m. on May 26. Dr. Vanam testified as a fact witness and was neither qualified nor offered as an expert.

Dr. Vanam explained that during his treatment of plaintiff, he determined based on a series of tests that defendant had not suffered a stroke. He then concluded plaintiff's condition was "probably . . . related to a metabolic encephalopathy, which is an altered mental status not related to a stroke." Dr. Vanam considered whether plaintiff's condition was the result of "drugs, infections and other possible causes," including "renal failure [and] liver failure." He ordered a series of tests, including a urine drug screen, to determine the cause of plaintiff's condition but "other than [a] positive" result for "benzodiazepines" from the urine drug screen, he "didn't find anything else."[4]

---

[4] The evidence showed there are many different benzodiazepines. The drug screen employed by the hospital did not identify a particular benzodiazepine or quantify the level of benzodiazepine in plaintiff's urine.

Dr. Vanam testified that plaintiff reacted positively when given flumazenil, an antidote for benzodiazepine poisoning. He explained that the presence of benzodiazepine was a consideration in assessing the cause for plaintiff's condition, but testified that he did not know the cause.

Dr. Vanam responded to questioning from the court soliciting his opinion as to whether benzodiazepine caused plaintiff's condition.

> [Dr. Vanam]: At that point, it wasn't ruled in as that was the only reason. We were just looking for -- and that was only positive evidence, at that point. Having benzos positive. So, we still kept looking to see if there were any other contributing factors.
>
> [Court]: And were any found?
>
> [Dr. Vanam]: None, at that point. None were found.
>
> [Court]: And, in your opinion, the causation for his medical condition was caused by what?
>
> [Dr. Vanam]: Well, I would say broadly, as a metabolic encephalopathy. Metabolic encephalopathy is a non-neurological condition. Metabolic encephalopathy, as I just said, can be from drugs, infections, other metabolic reasons like low or high blood sugars, low or high thyroid tests. All these -- any of those things can cause it. Infections, pneumonia, urinary tract infections. Infections in the belly.
>
> So, we looked at the blood test[,] renal panel, liver panel, chest X-rays. Normal urine analysis. And, so, we ran all those tests. And the only test, eventually,

8

was positive, was benzos. But, other than that, nothing else that we could find to be positive.

[Court]: Well, would that lead you to the conclusion that his medical condition was caused by ingesting benzoids?

[Dr. Vanam]: If I don't have any other source, and to my knowledge, we have not found anything. Then, that was one of the considerations.

Later, in response to questioning by defense counsel, Dr. Vanam testified that he did not know the cause of plaintiff's medical condition.

[Defense Counsel]: Okay, and you, as you sit here today, do not know what caused --

[Dr. Vanam]: Correct.

[Defense Counsel]: -- [plaintiff's] condition?

[Dr. Vanam]: That's correct.

Further, when defense counsel asked Dr. Vanam if he could testify with a reasonable degree of medical certainty that benzodiazepine caused plaintiff's medical condition, plaintiff's counsel objected and argued Dr. Vanam could not offer such an opinion because he was not an expert witness. Although the court previously directly asked Dr. Vanam for his "opinion" on the cause of plaintiff's condition, it sustained plaintiff's counsel's objection, finding Dr. Vanam could

9

not offer an opinion on causation because he had not been qualified, and was not testifying, as an expert witness.[5]

During defendant's case, she presented Dr. Philip Kramer, a neurologist employed at J.F.K. Medical Center who consulted on plaintiff's treatment at the hospital on May 28 and 29, 2016. Dr. Kramer was neither qualified nor offered as an expert witness. In pertinent part, he testified that a toxicology screening of plaintiff's blood on May 27, two days after defendant's admission to the hospital, showed no benzodiazepine in plaintiff's system.

---

[5] At oral argument before this court, plaintiff's counsel represented that during the hearing, he asked Dr. Vanam if it was the doctor's opinion within a reasonable degree of medical certainty that plaintiff's critical medical condition was caused by benzodiazepine and that Dr. Vanam responded in the affirmative. The record shows plaintiff's counsel never asked Dr. Vanam that question and Dr. Vanam never offered that opinion. The record shows the opposite. As noted, when defendant's counsel asked Dr. Vanam if he held any opinion within a reasonable degree of medical certainty concerning the cause of plaintiff's condition, plaintiff's counsel objected and argued Dr. Vanam should not answer because he was not an expert, and the court sustained the objection. Plaintiff's counsel's representations to this court during the course of oral argument are also contradicted by a more accurate acknowledgment in his brief: "[A]s [Dr. Vanam] did not know what [plaintiff] consumed or when, [he] would not offer an opinion as to what caused [plaintiff's] condition." We have decided to attribute plaintiff's counsel's clearly inaccurate representations during oral argument to inattention or inadequate preparation, and not as a violation of the duty of candor he owes his adversary and this court. See R.P.C. 3.3(a)(1); McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 371 (2001) (noting "[l]awyers have an obligation of candor to each other and to the judicial system").

A-2621-16T4

During his direct examination by defendant's counsel, Dr. Kramer was asked what caused plaintiff's condition, but Dr. Kramer did not provide a responsive answer. On cross-examination, plaintiff's counsel followed up, asking "[w]hat caused [plaintiff's] condition?" In response, Dr. Kramer noted that "in medicine one is often not 100 percent sure" but that he "believe[d] it was due to an overdose of . . . a benzodiazepine" because he had "no other explanation for [plaintiff's] loss of consciousness and recovery . . . in the timeframe in which it occurred."

Defendant's counsel then asked Dr. Kramer a question concerning the length of time a benzodiazepine would be present in a person's body after being taken, but he did not answer the question, stating that he is "not a toxicologist." He also could not answer defense counsel's inquiry concerning the amount of benzodiazepine that is required to render "an adult male of significant height and size . . . comatose." Dr. Kramer testified that "you need an expert to answer that question."

Defendant also presented Dr. Steven Marcus, who was qualified as an expert in the area of toxicology. Dr. Marcus testified that the urine screen test results were not sufficiently reliable to establish the presence of benzodiazepine in plaintiff's system, and that a confirmatory blood test should have been done.

11

He opined that plaintiff exhibited symptoms, including a right-side facial droop when he first became incapacitated, that are inconsistent with a benzodiazepine overdose and instead showed plaintiff suffered a transient mini-stroke. He testified to a reasonable degree of medical certainty that plaintiff's condition was not caused by benzodiazepine.

Plaintiff also called Dr. Clinton Ewing, a pathologist and director of the laboratory at J.F.K. Medical Center, who explained the hospital's laboratory testing procedures. Dr. Joseph Landolfi, a J.F.K. Medical Center neurologist and plaintiff's cousin, briefly testified he was advised about plaintiff's admission to the hospital and saw him in the hospital.

Following the submission of written summations, the court rendered an oral opinion finding defendant committed the predicate act of aggravated assault by placing benzodiazepine in the coffee and causing plaintiff's life-threatening medical condition. The court rejected defendant's contention that the positive urine screen may have been the result of the administration of benzodiazepine in the emergency room, and found "crucial" Dr. Vanam's testimony that he "believed . . . benzodiazepines to be the probable cause of the plaintiff['s] comatose condition." The court also found credible Dr. Kramer's testimony

"that he believed . . . plaintiff['s] condition was caused by an overdose of benzodiazepine."

The court rejected Dr. Marcus's expert testimony as not credible, finding he exaggerated and was argumentative, combative and inconsistent. The court also determined Dr. Marcus's expertise was limited to toxicology and he therefore was not qualified to render an opinion about the cause of plaintiff's neurological condition. The court found Dr. Marcus's conclusion plaintiff suffered from a transient mini-stroke was contradicted by hospital records showing the triage nurses did not observe a right-side facial droop and Dr. Vanam's testimony that testing showed plaintiff did not suffer a stroke.

The court concluded the evidence supports a rational inference defendant caused plaintiff's life-threatening condition by providing plaintiff with benzodiazepine. The court determined the inference is supported by the urine screen results and plaintiff's positive response to the administration of flumazenil. The court further relied on Dr. Vanam's and Dr. Kramer's opinions and found "that the circumstantial evidence is sufficient to conclude that the plaintiff's condition was caused by an overdose of benzodiazepine. Everything else had been ruled out." The court also drew a negative inference that defendant

committed the predicate act of assault under the PDVA based on her refusal to testify at the hearing.

The court accepted as credible plaintiff's testimony that he did not ingest any benzodiazepine prior to arriving at defendant's home on May 25, 2016, noted the circumstances surrounding defendant's unusual offer of the coffee on May 24, 2016, and delivery of the coffee the following day, and concluded "defendant, purposely or knowingly, poisoned plaintiff by administering benzodiazepine in his coffee."

The court found defendant committed the predicate act of assault under the PDVA. The court further found an FRO was necessary to protect plaintiff from future acts of domestic violence and entered the February 7, 2017 FRO. The FRO provided that defendant shall pay plaintiff's attorney's fees "incurred for this matter," but did not establish the fee award. In a March 7, 2017 order, the court entered a $49,542 judgment against defendant for payment of plaintiff's attorney's fees. This appeal followed.

## II.

"The general rule is that findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). We defer to the factual findings of a trial court unless

"they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (citation omitted). "'Only when the trial court's conclusions are so "clearly mistaken" or "wide of the mark"' should we interfere to 'ensure that there is not a denial of justice.'" Ibid. (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Our review of a trial court's legal conclusions is plenary. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

In its consideration of a request for entry of an FRO, the Family Part "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). The court must then determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

On appeal, defendant argues the court's determination that she committed the predicate act of assault is not supported by credible evidence. More particularly, she argues there is no evidence establishing the reliability of the

A-2621-16T4

urine drug screen or that benzodiazepine caused plaintiff's condition. She further claims the court violated her due process rights by drawing a negative inference based on her refusal to testify and assertion of her Fifth Amendment rights. She also contends the court's comments and questioning of witnesses conveyed a lack of impartiality that deprived her of a fair trial. Defendant last asserts the court erred by failing to consider and make findings concerning the reasonableness of plaintiff's counsel's attorney's fees.

We first address defendant's argument there is insufficient credible evidence supporting the court's finding that benzodiazepine caused plaintiff's condition. Plaintiff alleged, and the court found, defendant committed the predicate act of assault, N.J.S.A. 2C:12-1, under the PDVA, see N.J.S.A. 2C:25-19(a)(2), by purposely or knowingly causing plaintiff's life-threatening medical condition by administering benzodiazepine in the coffee. The court did not expressly refer to a subsection of N.J.S.A. 2C:12-1 in defining the particular offense it found defendant committed, but we surmise the court found defendant committed an aggravated assault in violation of N.J.S.A. 2C:12-1(b)(7) because it found defendant purposely or knowingly caused "significant bodily injury" to defendant by administering benzodiazepine in his coffee. See N.J.S.A. 2C:12-

16                                                                              A-2621-16T4

1(b)(7) (providing that a person commits an aggravated assault by purposely or knowingly causing significant bodily injury to another).

Plaintiff did not present any direct evidence showing defendant placed benzodiazepine in the coffee. Instead, plaintiff argued the court should infer defendant placed benzodiazepine in the coffee because his critical medical condition was caused by benzodiazepine and the only possible source of his consumption of benzodiazepine was the coffee defendant curiously gave him when he arrived to pick up his daughter. Proving plaintiff's critical medical condition was proximately caused by benzodiazepine was essential to his claim and the court's finding defendant committed the predicate act of aggravated assault. Stated differently, in the absence of proof establishing benzodiazepine caused plaintiff's critical medical condition, plaintiff and the court lacked any support for a finding defendant committed an assault.

"The test of need of expert testimony is whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment" as to a fact in issue. Butler v. Acme Mkts, Inc., 89 N.J. 270, 283 (1982). Expert testimony is required where the issue of proximate cause is "beyond the 'common knowledge of lay persons.'" Froom v. Perel, 377 N.J. Super. 298, 318 (App. Div. 2005) (citation omitted). For example, "[i]f [a]

17

plaintiff seeks to prove causation of a current medical or psychological condition, of course, competent expert testimony would be required." J.W. v. L.R., 325 N.J. Super. 543, 548 (App. Div. 1999); see also Kennelly-Murray v. Megill, 381 N.J. Super. 303, 311 (App. Div. 2005) (requiring expert testimony to establish an accident contributed to the cause of the plaintiff's cancer because a causal link could not be based on common knowledge).

Here, whether benzodiazepine caused plaintiff's medical condition presented an issue that required expert testimony. See generally Canesi v. Wilson, 158 N.J. 490, 505 (1999) (explaining that "medical causation" requires proof of a "causal relation between" a drug and a plaintiff's injuries). Plaintiff failed to present any expert testimony establishing that benzodiazepine was the proximate cause of his critical medical condition. Thus, the court was without sufficient evidence supporting its finding of a fact essential to its conclusion that defendant committed an assault: that plaintiff's critical medical condition was caused by benzodiazepine.

To be sure, there is significant and seemingly persuasive circumstantial evidence suggesting benzodiazepine caused plaintiff's condition. As noted by the court, the urine test confirmed the presence of benzodiazepine, and other testing did not reveal a cause for plaintiff's condition. The evidence further

A-2621-16T4

showed plaintiff's condition was consistent with a benzodiazepine overdose, and plaintiff reacted positively to an antidote for benzodiazepine. But the complexity of the issue of medical causation precluded the judge, as the factfinder, from surmising that benzodiazepine caused plaintiff's condition. See State v. Doriguzzi, 334 N.J. Super. 530, 538 (App. Div. 2000) ("A factfinder should not be allowed to speculate without the assistance of expert testimony in an area where the average person could not be expected to have sufficient knowledge or experience."). Indeed, plaintiff's treating physician, who handled defendant's care during his six-day hospitalization, discharged plaintiff with a diagnosis that the cause of his condition was unknown.

Lacking any expert testimony supporting its findings, the court relied on the testimony of Dr. Vanam and Dr. Kramer to support its causation determination, but we are convinced it was error to do so. Treating physicians may properly opine as to the cause of a patient's injuries or condition based only on their diagnoses and treatment of the patient. Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 577 (2016). "Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury," even

though not otherwise qualified as an expert. Ibid. (quoting Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 314 (1995)).

Dr. Vanam, who was aware of the positive urine test for benzodiazepine and plaintiff's positive response to the administration of the antidote for benzodiazepine, did not testify he diagnosed benzodiazepine as the cause of plaintiff's critical medical condition. To the contrary, he first testified he never determined the cause of plaintiff's condition and later stated only that benzodiazepine was "one of the considerations" as a potential cause. And when he was asked if he could offer an opinion as to the cause of plaintiff's condition to a reasonable degree of medical certainty, the court sustained plaintiff's objection because Dr. Vanam had not been qualified as an expert. Thus, the court's finding that Dr. Vanam testified the "probable cause" of plaintiff's condition was benzodiazepine is wholly undermined by the record.

Similarly, Dr. Kramer did not testify that he diagnosed defendant's medical condition as having been caused by benzodiazepine or that he treated plaintiff for any conditions caused by benzodiazepine. In fact, the toxicology blood screen taken on May 27, 2016, one day before Dr. Kramer first saw plaintiff, showed no benzodiazepine in plaintiff's system. Moreover, the voluminous medical records introduced at trial do not include any diagnosis

related to benzodiazepine made by Dr. Kramer or any of the numerous other physicians who were involved in plaintiff's care and treatment at the hospital.

"The testimony of a treating physician is subject to an important limitation. Unless the treating physician is retained and designated as an expert witness, his or her testimony is limited to issues relevant to the diagnosis and treatment of the individual patient." Delvecchio, 224 N.J. at 579; see also Rubanick v. Witco Chem. Corp., 125 N.J. 421, 452 (1991) (observing that an expert on the causes of cancer is more qualified to testify concerning the cause of a patient's cancer than a medical doctor who treats the cancer after it develops). Dr. Kramer's testimony exceeded that limitation here. He did not testify as to any diagnosis he made or treatment he rendered based on benzodiazepine being the cause of plaintiff's medical condition. Instead, he testified only that he "believe[d]" defendant's medical condition was caused by benzodiazepine. Dr. Kramer was never qualified or offered as an expert witness and expressly disavowed being an expert, stating he was not qualified to answer questions concerning the manner in which benzodiazepine would have been processed in plaintiff's body.[6] Moreover, his testimony constituted an

---

[6] When defense counsel asked if Dr. Kramer would expect benzodiazepine to be present in the blood of someone who overdosed on the drug two days earlier,

inadmissible net opinion because there is no evidence as to the standard he applied in forming his belief.[7] <u>Pomerantz Paper Corp. v. New Cmty. Corp.</u>, 207 N.J. 344, 373 (2011) ("[A] trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified.").

We are convinced it was plain error, <u>R.</u> 2:10-2, for the court to allow Dr. Kramer to testify as to his belief and for the court to rely on his testimony to support its conclusion benzodiazepine caused plaintiff's critical medical condition. We are therefore constrained to reverse the court's finding that defendant committed the predicate act of assault. The court's conclusion is

_____

plaintiff's counsel objected, asserting in part that Dr. Kramer was a "non-expert" witness.

[7] Dr. Kramer's belief about the cause of plaintiff's medical condition was not admissible as a differential diagnosis. <u>See</u> <u>Creanga v. Jardal</u>, 185 N.J. 345, 356 (2005) (explaining that "courts have used the term [differential diagnosis] . . . to describe the process by which <u>causes</u> of the patient's <u>condition</u> are identified" (quoting <u>Clausen v. M/V New Carissa</u>, 339 F.3d 1049, 1057 n.4 (9th Cir. 2003))). A differential diagnosis is admissible only if "[i]n rejecting alternative hypotheses, the expert . . . use[s] 'scientific methods and procedures' and justif[ies] an elimination on more than 'subjective beliefs or unsupported speculation.'" <u>Id.</u> at 358 (quoting <u>Claar v. Burlington N. R.R.</u>, 29 F.3d 499, 502 (9th Cir. 1994)). Dr. Kramer never testified he made a differential diagnosis concerning the cause of plaintiff's condition and his testimony about the cause is untethered to scientific methods or procedures and, as he said, constitutes only his belief.

22

founded on a finding of causation that is "so manifestly unsupported by . . . competent, relevant and reasonably credible evidence as to offend the interests of justice." Gnall, 222 N.J. at 428 (citation omitted). We therefore reverse the domestic violence FRO and the court's order awarding plaintiff attorney's fees pursuant to N.J.S.A. 2C:25-29(b)(4).

Because we reverse the court's entry of the FRO, it is unnecessary to address defendant's remaining claims concerning the judge's alleged lack of impartiality during the trial, the court's drawing of a negative inference based on defendant's refusal to testify and the court's calculation and award of attorney's fees.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2621-16T4