FORT KNOX NATIONAL BANK, Appellant,

v.

Edith M. GUSTAFSON et al., Appellees.

Court of Appeals of Kentucky.

Dec. 18, 1964.

Robert E. Hatton, L. Lyne Smith, Jr., Louisville, for appellant.

Edwin O. Davis, Louisville, for appellees.

DAVIS, Commissioner.

Appellee Edith M. Gustafson recovered judgment against appellant Fort Knox National Bank (hereinafter referred to as bank), pursuant to a jury's verdict awarding her compensatory damages of $20,500 and punitive damages of $15,000. The judgment was predicated upon appellee's claim that appellant was guilty of the tort of "abuse of process." The "process" involved was a claim and delivery action which the bank filed for the purpose of obtaining possession of a mobile diner on which it had a security interest, created by security agreement executed to it by Arthur J. Gustafson and Edith M. Gustafson. (We shall hereafter refer to the Gustafsons by their first names.)

The basic questions to be adjudged are: (1) did the bank have legal cause to accelerate the maturity date of the note due

it from Arthur and Edith; (2) if so, was the claim and delivery proceeding so improperly prosecuted as to give rise to the damages allowed by the jury and the judgment? There are subordinate questions to be discussed in the course of the opinion. Determination of the dispute will necessitate consideration of pertinent portions of the Uniform Commercial Code (hereafter designated as UCC), which is embraced in KRS Chapter 355.

The factual background from which this lawsuit developed is as follows: Arthur and Edith executed their joint note to the bank on October 12, 1960, in the sum of $7,380, by the terms of which they agreed to repay the bank in monthly payments of $205 each. Simultaneously with the loan, and as a part of the transaction, Arthur and Edith assigned to the bank a certain lease in which E. H. Harris was lessor and the Gustafsons were lessees. The lease provided rental payments of $100 per month for a lot upon which the Gustafsons located the mobile diner; a restaurant was operated in the diner by the Gustafsons.

The note contained an acceleration clause, authorizing the holder to precipitate the maturity date in the event the makers defaulted in any monthly payment. The acceleration clause also provided that the holder of the note could declare it due before maturity if the holder felt insecure. This type of acceleration is permitted by the UCC:

> "A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised." KRS 355.1–208.

At the outset, Arthur and Edith operated the restaurant together. Arthur was engaged in several other enterprises, but none of them prospered. In fact, it was shown that after the loan was made checks aggregating more than $20,000 were presented to the bank against one of Arthur's accounts, but were returned because of insufficient funds. The bank account for the restaurant business had been overdrawn during thirteen of the twenty-five months next after the loan date.

At the time the loan was made, Arthur was a member of the U. S. Army, with seventeen years of service and a stated regular income from the government. After the loan was made, Arthur resigned from the army—as a hardship case—in an effort to rehabilitate his deteriorating financial enterprises.

In October, 1961, Edith went to Texas on account of the critical illness of her father. Arthur's financial position in the restaurant business so worsened that he abandoned the restaurant and betook himself to New York. This occurred in June, 1962.

Edith then returned from Texas and learned that Arthur had failed to pay the rent for the lot whereon the diner was situated, so that an obligation of $800 for eight months of unpaid rent had accrued. Edith discussed the dismal financial condition with an officer of the bank. The bank's officer testified that he assured Edith that the bank would "go along" with her efforts to rehabilitate the business, but only upon the condition that she could furnish the bank a list of all the creditors, along with their assurance that they too would "go along." The bank's officer said that an oral "indulgence" had been made to Arthur, by the terms of which the bank permitted the monthly payments to be one day less than two months in arrear without asserting default. The officer told Edith the bank would grant her that indulgence, but only if she could obtain the consent of all creditors to refrain from closing in.

Sometime in July or August, 1962, Edith discussed possible bankruptcy proceedings, looking toward obtaining the debtor relief provided by a composition with creditors. This discussion was had with attorney Morris Britt—the same attorney who subsequently represented the bank in filing the claim and delivery action.

By avowal, it was shown that sometime in September, 1962, an incident occurred on the lot leased from Harris. The episode related to an alleged disorder on the lot which drew the attention of local police. Harris said he was called by telephone about 4:00 a. m. incident to the alleged disorder. According to Harris, the reports of disorders, plus the rental default, prompted him to insist that Edith vacate the lot by October 1, 1962.

The hazard insurance policy covering the diner and contents was permitted to lapse for nonpayment of premium. According to evidence for the bank, Edith assured the bank's officer that she would procure insurance, but she failed to do it—and finally stated that she had no funds for the premium. The bank advanced $242.49 for insurance, as permitted by the terms of the security agreement. (Later this insurance was cancelled so that the actual premium liability was only $16.25.)

On September 5, 1962 Edith obtained a "payoff" statement from the bank; this statement recited that the amount required to discharge the loan was $2,936.93, and that, "This payoff is good through October 12, 1962." Edith explained to the bank's officer that she contemplated refinancing her indebtedness. This statement did not extend maturity date.

On or about September 18, 1962, the bank caused its attorney, Morris Britt, to investigate the records of Meade County to determine what claims, if any, appeared of record against the Gustafsons. About the same time the bank had learned from Harris, the landlord, that Harris desired that the diner be removed from his lot. Britt reported a chattel mortgage of $596.80 to People's Industrial Plan, which appeared to create a second lien on the diner, plus a "blanket" lien of $38.59 relating to certain unemployment insurance liabilities. Also, Britt advised the bank that he had learned of a judgment against Arthur and Edith in the sum of $1,704.42; the judgment had been rendered September 8, 1961; execution had been issued upon the judgment, but not levied.

On September 25, 1962, the bank paid Harris $800 to cover the past due rent, and took from him an assignment of his interest in the lease. On the same day the bank filed the claim and delivery action from which the present appeal stems. It is shown that the bank had not advised Edith of its intent to file the claim and delivery, although the day before the bank had made arrangements with a garageman from Elizabethtown to remove the diner.

For Edith, it was shown that she vigorously protested against the repossession, and that she assured the bank's officers she had made arrangements to fully pay the loan. She was corroborated in this by testimony from a Mr. Tandenhaus, executive officer of a lending agency in Louisville. The latter testified that he spoke over the telephone with officers of the bank during the progress of the discussions attendant upon the repossession, and assured them that "you don't have a thing to worry about,—Fort Knox Bank is going to be paid off, we have okayed the loan." The bank's officer denied that Tandenhaus had made such unequivocal assurances of paying the loan. Evidence was heard to the effect that one bank official said he did not "give a damn" what had to be done toward effecting the physical removal of the diner as opposed to the claim that Edith declared that she would "own the Ft. Knox Bank" as the result of the repossession.

The trial court concluded that the appellant had imperfectly obtained possession of the diner because of what the trial court construed as failure to comply with the

bond requirement for claim and delivery. See KRS 425.135.

Pursuant to this holding, the trial court gave a directed verdict for Edith against the bank for compensatory damages, both as to the diner as a physical item and as to the Kozy Kottage Restaurant, as a going concern and business. Further, the lower court gave the jury an instruction authorizing punitive damages against the bank if the jury believed that the bank's officers "in the obtention of the Order of Claim and Delivery and the performance of acts under its authority" abused its use as defined in another instruction predicated on the definition of "abuse of process." The latter instruction required the jury to believe that the bank used the claim and delivery process in a willful and malicious manner, recklessly disregarding the rights of the Gustafsons. We have concluded that the trial court erred in deciding that the claim and delivery was improperly obtained, and that further error was committed in submitting the issues of damages, compensatory and punitive, in the manner done.

The first question to be resolved is whether the loan was in default. Default could occur under the terms of the security agreement if the Gustafsons were delinquent in prescribed payments. Additional bases for "default" rest in the bank's feeling "insecure"—and in the failure of the Gustafsons to "comply with any condition" of the mortgage.

It is conceded that from the inception date of the loan to the time of the repossession, the actual terms of the note provided for 23 monthly payments of $205 each, and that only 22 such payments had been made. It is Edith's contention that this default had been waived by the "indulgence" agreement, permitting the payments to be one day short of two months behind. The bank counters this with the idea that the "indulgence" was contingent upon Edith's obtaining the consent that all creditors "go along"—and that such agreement had not been obtained.

Additionally, Edith points out that the *legal* obligation to the bank was not in default, since the original transaction is so tainted with usury that the 22 payments made actually overpaid the legal sum due. We shall discuss this contention later in the opinion.

It has been mentioned that the note contained the acceleration clause upon the bank's feeling insecure. The Uniform Commercial Code deals with this basis for acceleration in KRS 355.1–208, as hereinbefore quoted.

It will be observed that the statute places the burden of establishing the lack of good faith upon the party against whom the acceleration power has been exercised. "Good faith" is a golden thread woven into the entire fabric of the Uniform Commercial Code. See KRS 355.1–203. "Good faith," as defined in the Uniform Commercial Code, "means honesty in fact in the conduct or transaction concerned." KRS 355.1–201(19).

By the terms of KRS 355.1–201(8) the "burden of establishing" any fact is said to mean "the burden of persuading the triers of fact that the existence of the fact is more probable than its non-existence." We construe the latter provision as requiring the submission to the jury of the issue of good faith unless the evidence relating to it is no more than a scintilla, or lacks probative value having fitness to induce conviction in the minds of reasonable men. James v. England, Ky., 349 S.W.2d 359. It is our view that the evidence on that score is so conclusive as to warrant a directed verdict for the bank on this issue. It must be remembered that here we are dealing with the "good faith" *belief* of the bank—that is, its state of mind.

This view makes it unnecessary to determine whether the maturity of the loan was accelerable because of payment default, or because of admitted default in rent payments.

■ Since the acceleration clause was properly invoked, the bank had a right to obtain possession of the collateral by the terms of the security agreement. This right of possession is specifically assured by KRS 355.9–503, which provides that the secured party may proceed to obtain such possession without judicial process, if this can be accomplished without breach of peace—or by judicial action. Here it is agreed that repossession could not be had peaceably. Thus, we are left to consider whether the judicial action was so defective as to expose appellant bank to the damage claims here asserted.

The claim and delivery procedure formerly contained in Civil Code Sections 180 through 193 is now embodied in KRS 425.120 through 425.180. A sheriff is absolved from the duty to enforce the order until a bond is executed as set out in KRS 425.135. Although two other types of bonds are mentioned (KRS 425.140 and 425.155) they have no pertinence in the case at bar.

The bank did execute a bond with corporate surety. One copy of the bond was filed with the circuit court clerk, one was delivered to the sheriff, and one was given to the individual who took the diner from the Harris lot. However, the bond did not contain a covenant that the bank would "duly prosecute the action"; neither did it specifically provide that the bank would perform the judgment of the court "by returning the property, if a return thereof shall be adjudged." There was no provision in the bond guaranteeing that the bank would pay the Gustafsons "not exceeding double the value of the property and the costs of the action." However, the bond did provide that its makers would "pay to any claimant thereof the damages he may sustain in consequence of the seizure or sale—."

■ Upon the authority of General Motors Acceptance Corp. v. Curry, Ky., 338 S.W.2d 897, we hold that any technical flaw (if indeed there was one sufficient to invalidate the process) in the claim and delivery action did not afford a cause of action to appellee for the taking of the diner. We think Stoll Oil Refining Co. v. Pierce, Ky., 337 S.W.2d 263, is compatible with the decision in the Curry case, supra, and with our present holding. Although it is true that we approved an award for nominal damages in Stoll Oil Refining Co. v. Pierce, supra, we conclude that KRS 355.9–507(1) expresses the statutory policy and view of the Uniform Commercial Code that the debtor is confined to recovery of "any loss caused by a failure to comply." In this sense, we construe "loss" to relate to actual compensatory damages—not nominal damages. We think this same concept is implicit in KRS 355.1–106.

■ As we have concluded that the bank acted in "good faith," it follows that no issue as to punitive damages was shown. Punitive damages do not flow from "good faith" conduct. Cf. Home Finance Co. v. Ratliff, Ky., 374 S.W.2d 494.

■ It was incumbent on the bank to comply with the requirements of KRS 355.9–504(3), which requires that repossessed collateral be sold or disposed of by the secured party in a commercially reasonable manner. The record before us is voluminous, but it does not contain an adequate account of the disposition of the diner by the bank. The issue as to whether the sale was commercially reasonable was not developed in evidence, nor was it submitted to the jury. Upon another trial, details as to the sale and whether it was commercially reasonable will be developed in evidence, and any appropriate issues reflected in the evidence will be submitted to the jury.

■ In this connection, it must be noted that KRS 355.9–507(1, 2) relate to the measure of damages applicable here. The debtor is entitled to recoup any "loss" caused by failure of the secured party to comply with the Uniform Commercial Code. However, the mere fact that a better price could have been obtained by sale at a different time, or different place or manner is not

of itself sufficient to establish that the sale was not commercially reasonable.

■ Appellee is not entitled to recover any damage for asserted loss as to the business. We have said that the bank was entitled to the possession of the diner under the terms of the security agreement. Manifestly, taking the diner into possession presupposes terminating the restaurant business conducted in it by the Gustafsons. The consequent disruption of the restaurant business incident to the legal repossession of the diner was a result which the Gustafsons impliedly consented to in the security agreement.

The view we take of the case makes unnecessary any discussion of whether Arthur's assignment to Edith (after the repossession) came too late to afford Edith a right to maintain the counterclaim. We hold that she is entitled to maintain the counterclaim for any loss properly attributable to failure, if any, of the bank to conduct a commercially reasonable sale.

The parties addressed evidence and argument in the lower court pertaining to the claim that the note to the bank contained usury. However, there was no specific pleading that the note be purged of usury. Doubtless this came about because the bank never sought any money judgment on the note. Since the lower court has not had the opportunity to pass on the suggested usury, we do not reach the question.

Likewise, our disposition of the case makes it unnecessary to rule on the alleged errors in admission of evidence submitted by the bank, as none of the items of evidence which the bank claims should have been admitted will be pertinent to any issue upon a new trial.

The judgment is reversed, with directions to grant a new trial, which will be limited to purgation of usury, if any, and whether the sale of the collateral by the bank was commercially reasonable, and, if not, what damages, if any, resulted from an improper sale.