**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1777-19
              A-1778-19

BANK OF CHINA, NEW YORK
BRANCH,

     Plaintiff-Respondent,

v.

L.V.P. ASSOCIATES, LLC,

     Defendant-Appellant,

and

PAUL V. PROFETA,

     Defendant.

_____

BANK OF CHINA, NEW YORK
BRANCH,

     Plaintiff-Respondent,

v.

349 ASSOCIATES, LLC,

     Defendant-Appellant,

and

PAUL V. PROFETA,

    Defendant.

_____

Argued February 24, 2021 – Decided December 30, 2021

Before Judges Ostrer, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket Nos. F-018514-17 and F-018508-17.

Marc J. Gross argued the cause for appellants (Fox Rothschild LLP, attorneys; Marc J. Gross, of counsel and on the briefs; Christine F. Marks, on the briefs).

Joseph Lubertazzi, Jr., argued the cause for respondent (McCarter & English, LLP, attorneys; Joseph Lubertazzi, Jr., of counsel and on the briefs; Danielle Weslock, on the briefs).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

In these back-to-back appeals, we consider again, but from a different vantage point, the inter-related commercial mortgage loans that the Bank of China ("the Bank") made to three limited liability companies owned by Paul V. Profeta: defendant LVP Associates, LLC ("LVP"), defendant 349 Associates, LLC ("349"), and 769 Associates, LLC ("769"). In 2007, the bank loaned:

$14.35 million to 769, $10.5 million to 349, and $7.35 million to LVP, secured by, respectively, mortgages on commercial office buildings at 769 Northfield Avenue in West Orange, 349 East Northfield Avenue in Livingston, and 2128-2144 Millburn Avenue in Maplewood. Each interest-only loan matured on July 1, 2017.

We previously affirmed a final judgment of foreclosure of the mortgage securing the 769 loan. Bank of China, New York Branch v. 769 Assocs., LLC, No. A-2100-18 (App. Div. Oct. 8, 2020). And before that, the federal court in New York interpreted disputed provisions of the loan agreements. LVP Assocs., LLC v. Bank of China, New York Branch, No. 17-cv-5274 (SHS), 2017 U.S. Dist. LEXIS 190188 (S.D.N.Y. Nov. 16, 2017). We assume the reader's familiarity with those decisions, including the facts discussed therein, and give collateral estoppel effect to the federal court's interpretation of the loan agreements in its summary judgment ruling. See Tarus v. Borough of Pine Hill, 189 N.J. 496, 520 (2007) (barring relitigation of issues determined in prior federal action between same parties involving same issue).[1]

---

[1] Each transaction also included three other documents: the promissory note (which incorporated the loan agreement's terms), a mortgage, and an assignment of leases and rents and security agreement.

We consider here the Bank's foreclosure actions against 349 and LVP. There is no dispute that defendants did not pay the balance due on their loans at maturity. But that nonpayment occurred only after the Bank refused to permit defendants to prepay their loans a month before maturity and to secure the release of the mortgage liens, so they could sell their properties. In defense of the foreclosure action, defendants argue that but for the Bank's wrongful actions, there would have been no default.

The Bank invoked the loan agreements' cross-default provision, which makes it an event of default by one borrower, if there is an event of default by one of the two other borrowers. The Bank contends that multiple pre-maturity defaults by 769 constituted defaults by defendants, which justified the Bank's refusal to release the mortgage liens upon prepayment. The bank alleges that (1) there was a "material adverse change" in 769's "financial condition or results of operations . . . or . . . the value of [its] Property"; (2) the Bank "in the exercise of its sole reasonable discretion, deem[ed] itself insecure"; and (3) the ratio of 769's net operating income to its debt service — the "Debt Service Coverage Ratio" or "DSCR" — had fallen below the required 1.25 to 1.

The General Equity Part agreed that 769's pre-maturity defaults justified the Bank's actions. The trial court granted the Bank summary judgment, striking

4

defendants' answers and counterclaims, and deeming the Bank's foreclosure complaints as uncontested; and the court later entered final judgments for foreclosure.

On appeal from those orders, defendants contend there were genuine issues of material fact contesting each alleged pre-maturity default. They also contend that the bank breached the loan documents, violated the implied covenant of good faith and fair dealing and acted inequitably. They also argue summary judgment was premature because discovery was incomplete.

We review the trial court's summary judgment order de novo, applying the same Rule 4:46-2(c) standard as the trial court — that is, whether "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405-06 (2014). To perform our role, we "review the competent evidential materials submitted by the parties," just as the trial court did. Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). Not any factual issue will defeat summary judgment; the issue must be material and the motion may be granted "when the evidence 'is so one-sided that one party must prevail as a matter of law.'" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). We also

5

review de novo legal issues, including issues of contract interpretation, "[a]bsent an ambiguity arising from disputed facts." Ace Am. Ins. Co. v. Am. Med. Plumbing, Inc., 458 N.J. Super. 535, 539 (App. Div. 2019).

Applying those standards, we affirm.

## I.

We first consider defendants' argument that there are genuine issues of material fact regarding 769's pre-maturity defaults: (1) material adverse change in 769's financial condition, operating results or property value; (2) the Bank, exercising its reasonable discretion, deemed itself insecure; and (3) 769 failed to meet the DSCR.

## A.

We begin by reviewing the record evidence to support the Bank's claim that there was a "material adverse change" in 769's financial condition, operations results, or property value.[2]

---

[2] We agree with defendants that the Bank provided no support for its contention, in its May 4, 2017, default letters to defendants, that there was a material adverse change in their (not 769's) financial condition, operating results or property value. However, in May 10, 2017 letters to defendants, the Bank invoked the cross-default provision to assert that defendants were in default because of 769's default, including the material adverse change in 769's financial condition, operating results or property value.

6

There is no reasonable factual dispute that there were adverse changes. The third-party vacancy rate at 769's building grew from twenty-seven percent in 2010, to the low-to-mid-forties between 2012 and 2015, to sixty-two percent in 2016. Though the parties do not attempt to define "results of operations" or "financial condition" as set forth in the Amendment to Loan Agreement, the plain meaning of the terms would appear to encompass this change. Cf. Herman v. Sunshine Chem. Specialties, 133 N.J. 329, 345 (1993) (stating, in context of punitive damages determination, that "financial condition" "roughly means the ability to pay"). Furthermore, although Profeta or his entities leased the balance of space, as they were entitled to do under the loan agreements, the drop in third-party leases was indisputably a negative development. That is so, notwithstanding Profeta employee Steven Coleman's assertion that 769 was accumulating a large vacant space in the hopes of leasing it to a single large tenant. Unless and until he succeeded, the building was worse off.

The value of the property had also fallen from almost $16 million in 2009 to just over $8 million in 2017. It matters not that the Bank did not obtain a formal appraisal until after it declared the default. The Bank relied on the expertise of its employees who opined, based on the rent rolls and general economic conditions, the property's value had fallen. The appraisal bore that

7

opinion out. Furthermore, Coleman confirmed that 769's own employees were aware the property's value was less than the indebtedness. And Profeta candidly admitted that both he and the Bank were "aware that [the 769] property [was] worth less than the loan balance." He also admitted that he had not "express[ed] any disagreement" with executive vice-president of the Bank Raymond Qiao's May 2017 estimate that the property was worth about $8 million.

In April 2017, Coleman provided the Bank with a statement of operations showing 769's net operating income had fallen from $409,000 in 2014 to $10,700 in 2016 (after dropping consistently from over $2 million in 2009 to $542,000 in 2013). Defendants contend that Coleman (unintentionally) mischaracterized numerous Profeta leases as month-to-month, instead of annual leases. That depressed the net operating income because Coleman omitted month-to-month rent revenue from his calculations. Defendants allege the Bank must have recognized Coleman's mistake, because Bank employee Jeffrey Goldman admitted he reviewed the loan file, including the leases, earlier that month. We need not resolve this factual dispute, because the vacancy rate increase and property value decrease sufficed as adverse changes.

The question is whether these adverse changes were material. Notably, the loan agreements do not define "material adverse change." However, material

adverse change clauses and related material adverse effect clauses are commonly found in lending and merger and acquisition agreements. See e.g. Hexion Specialty Chems., Inc. v. Huntsman Corp., 965 A.2d 715, 738 (Del. Ch. 2008) (referring to "the ubiquitous material adverse effect clause" in mergers and acquisition agreements); 5 Banking Law § 112.10 (identifying material adverse change clause as one of several common acceleration provisions in loan transactions). Therefore, we turn to case law and common usage to interpret the clause.

At the outset, we reject defendants' contention that determining if a material adverse change has occurred involves a subjective standard.[3] See In re Chatham Parkway Self Storage, LLC, 507 B.R. 13, 20 (Bankr. S.D. Ga. 2014) (rejecting argument that "material adverse change" clause granted lender unfettered discretion based on what it subjectively believed was adverse). Rather, in deciding if an adverse change is material, we consider what a reasonable lender under the circumstances would deem material. See In re IBP S'holders Litig. v. Tyson

---

[3] One might think a subjective standard — as in, "I know when I see it" — would disadvantage defendants. But defendants contend a subjective standard implicates the state of the mind of the party invoking the material adverse change clause, and issues of state of mind are inappropriately resolved on summary judgment. Also, delving into the Bank's "subjective" state of mind, defendants contend the Bank did not really deem the changes material; rather, they used the changes as a pretext to declare default.

A-1777-19

Foods, 789 A.2d 14, 68 (Del. Ch. 2001) (viewing analogous material adverse effect clause in acquisition agreement through eyes of "reasonable acquiror"); Joseph B. Alexander, Jr., The Material Adverse Change Clause, 51 No. 5 Prac. Law 11 (Oct. 2005) (stating, regarding "material adverse event clauses" in merger and acquisition agreements, "courts generally adopt the objective standard of what a reasonable purchaser would view as being material").

Transitory changes in a borrower's finances are unlikely to qualify as material. Applying New York law to a material adverse effect clause in an acquisition agreement, the Delaware Court of Chancery held: "[a] short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer term perspective . . . . " IBP S'holders Litig., 789 A.2d at 68. In other words, the material adverse effect should "substantially threaten the overall earnings potential of the target in a durationally-significant manner." Ibid. See also Hexion Specialty Chems., 965 A.2d at 738 (stating that "poor earnings results must be expected to persist significantly into the future" to qualify as a "material adverse effect"). Furthermore, in determining whether a material adverse change or effect has occurred, the factfinder must consider the adverse change "in the context in which the parties were transacting." Ibid.

A-1777-19

Also, a material adverse change may be one that is unforeseen or unexpected. In <u>Capitol Justice LLC v. Wachovia Bank, N.A.</u>, 706 F.Supp.2d 23, 29 (D.D.C. 2010), the bank invoked a provision entitling it to terminate a loan commitment upon a "material adverse change in the capital, banking and financial market conditions that could impair the sale of the loan." The court held the provision was ambiguous as to whether the change had to be unforeseeable; and there was a genuine issue of fact as to whether the change in market conditions "could impair" the loan sale. <u>Id.</u> at 29-31. <u>See also</u> <u>Liberty Media Corp. v. Vivendi Universal, S.A.</u>, 874 F. Supp. 2d 169, 176 (S.D.N.Y. 2012) (permitting expert to testify the material adverse effect clauses "are meant to protect against unknown risks").

We also look to dictionary definitions absent a contractual one. <u>See</u> <u>10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.</u>, 634 F.3d 112, 120 (2d Cir. 2010) (permitting resort to dictionary to determine undefined contractual terms); <u>James v. Fed. Ins. Co.</u>, 5 N.J. 21, 25 (1950) (resorting to dictionary definition to construe word in insurance contract). <u>Black's Law Dictionary</u> (11th ed. 2019) defines "material" to mean "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential."

11

Here, importantly, the "material adverse change" pertains to 769, not markets or economic conditions that might impact 769. With that as the focus, we conclude that the "material adverse change" in 769's operations or property value must have been more than a foreseeable "hiccup" in the ups and downs of the commercial real estate business in which 769 was engaged. The change must have been enduring and of significant proportion. To be "material" in the "context" of the loan transaction and the Bank's decision-making, the adverse change had to affect the financial risks associated with making and holding the loan.

Measured against this standard, we are satisfied that the vacancy rate rise and property value drop were material adverse changes. Particularly once the property's value dropped significantly below the $14.35 million indebtedness, the loan was significantly under-collateralized. It would have been unreasonable for the Bank to loan $14.35 million secured by a mortgage on an $8 million building. Furthermore, the vacancy rate rise was no transitory blip. It was a consistent trend that played out over several years, which raised reasonable questions about 769's capacity to sustain itself without continued and growing infusions of cash from Profeta. Consequently, the vacancy rate rise significantly increased the Bank's risk in holding the loan.

Defendants contend the adverse changes were not material because if they had been, the Bank would have acted sooner. But 769's finances worsened over time. Besides, "a creditor's temporary forbearance in exercising its remedies upon its debtor's default does not preclude the creditor from subsequently exercising those rights." Glenfed Fin. Corp. v. Penick Corp., 276 N.J. Super. 163, 177 (App. Div. 1994). To hold otherwise would have the ill effect of encouraging "lenders to play hardball in the face of every default, no matter how minor." Id. at 178 (quoting Fasolino Foods Co. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1059 (2d Cir. 1992)). Furthermore, the loan agreements expressly provided that the Bank did not waive a right to declare default because it had failed to act sooner.

Finally, defendants contend that they should have been allowed to present an expert's opinion that there were no material adverse changes. We recognize that defendants' expert had not completed his report when the Bank filed its motion. Instead, he wrote a short letter summarizing his conclusions. But, without providing the reasoning for those conclusions, they failed to create a genuine issue of material fact. See Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (stating the net opinion rule bars an expert's conclusion unsupported by factual evidence and explanation of reasoning).

13

In sum, there was a material adverse change in 769's financial condition and operating results, which constituted a pre-maturity default by 769, and, based on the cross-default provision, an event of default by defendants.

B.

The Bank also declared 769 in default — and therefore, defendants were in default, too — because the Bank deemed itself "insecure." A lender's "[i]nsecurity may be found either as to the debt itself or as to the collateral" securing it. Van Bibber v. Norris, 419 N.E.2d 115, 124 (Ind. 1981).

The same developments that produced the material adverse change support the Bank's claim of insecurity: the vacancy rate rise and the DSCR non-compliance, which pertain to the ability to pay the debt, and the property value drop, which pertains to the collateral.

But the Bank adds one more significant development that made it insecure: 769's own statements — by its representative Coleman — that it would not be able to repay the 769 loan upon maturity and it would instead assist the Bank — which presumably would take title after default — in the Bank's efforts to lease space there. We conclude that there is no genuine issue of material fact that 769 communicated it would not pay off the loan on time; and that such

14

communication was sufficient to cause a reasonable lender in good faith to deem itself insecure.

Coleman made the insecurity-causing statements at an April 25, 2017, meeting that included Profeta, Goldman and Qiao. Profeta had orally informed the Bank's representatives that he wanted to prepay defendants' loans so he could sell the buildings to buyers he identified. Qiao responded that the Bank would not permit defendants to do so if it did not pay down or pay off the 769 loan. Coleman confirmed in his deposition that he informed the Bank's representatives that 769 would not pay its loan at maturity.

> Q.    During the meeting did either Mr. Profeta or you say to the bank that the 769 Associates loan would be paid in full by July 1, 2017?
>
> A.    No.
>
> A.    Did you ever say it [(the 769 loan)] would not be paid by July 1, 2017
>
> A.    Yes, sir.
>
> Q.    During the [April 25, 2017] meeting?
>
> A.    During the meeting.

Coleman also said he and Profeta would help the Bank lease and sell 769's building, impliedly after it took title, because 769 would be unable to pay the loan at maturity.

A-1777-19

Q. . . . . Was there any discussion at the meeting of April 25, 2017 about selling the 769 Associates building?

A. Yes.

Q. And what was discussed?

A. We would help them, them being the Bank of China.

Q. Help them what?

A. Lease up and sell the building.

Q. Why were you saying that you would help the bank. The bank wasn't the owner of the 769 property at the time of the meeting, correct?

A. As of April 25th, correct.

Q. So, therefore, why was the borrower — why were Mr. Profeta and you offering to help the bank lease up and sell that property?

A. We needed more time.

Q. More time past the maturity dates?

A. More time past July 1, 2017.

Q. And it was discussed that the 769 Associates borrower was not in the position as of the time of the meeting to pay off that loan by the July 1, 2017 maturing date, correct?

A. Correct.

A-1777-19

Qiao confirmed in his affidavit that Profeta and Coleman told him that the 769 loan would not be paid on July 1, 2017, and they asked to extend the maturity date.

Defendants dispute that Profeta and Coleman said 769's loan would not be paid and 769 wanted an extension. They rely on Coleman's recantation of his testimony. Soon after his disclosure, a brief recess was taken in his deposition and then Coleman did an about-face and claimed 769's loan was never discussed.

> A. I'm a little confused about this April 25th meeting.
>
> Q. Go ahead.
>
> A. My original testimony talked about we were going to prepay those two loans.
>
> Q. Correct.
>
> A. And that's all we talked about. We never discussed at all the 769 loan. We came with documentation on 349 and 2130 [LVP's building address], to sell those two loans and to prepay them.
>
> Q. Sell those two loans?
>
> A. We came with documentation to show that we were going to prepay those two loans. And that was the only thing discussed at that meeting. We never discussed what we were going to do with regard to 769 Associates.

Q. And if Mr. Profeta testified differently he would be wrong?

A. My recollection is that we only discussed prepaying those two loans and we never discussed the resolution of the 769 mortgage.

Defendants also note that in a memo Goldman wrote to the Bank's risk management department five days after the meeting, he did not expressly report that Profeta or Coleman said that 769 would default. However, Goldman said that "PVP asked if BOC would provide either an extension to him on 769 Associates or consider financing all three properties as a package to a new buyer" and Goldman expressed concern that 769 would default.

We hold the evidence is so one-sided that no reasonable jury would find that neither Coleman nor Profeta conveyed to the Bank's representatives that 769 was unable to pay off its loan at maturity. Coleman's own contradiction of his detailed testimony fails to create a genuine issue of material fact. Rather, "the alleged factual issue . . . can be perceived as a sham, and as such it is not an impediment to a grant of summary judgment." Shelcusky v. Garjulio, 172 N.J. 185, 194 (2002).

The so-called "sham affidavit doctrine" can be used to prevent a party opposing a summary judgment motion from creating material issues of fact by presenting the party's own contradicting statements. Id. at 201-02. The doctrine

18

may not be applied "mechanistically." <u>Id.</u> at 201. Courts should not reject alleged sham factual disputes "where the contradiction is reasonably explained," or the subsequent statement "does not contradict patently and sharply the earlier deposition testimony," or "confusion or lack of clarity existed" during the initial deposition questioning and the subsequent statement "reasonably clarifies" the first one. <u>Id.</u> at 201-02.

Here, defendants provide no reason to withhold applying the doctrine. There was nothing confusing or unclear about the questioning that elicited Coleman's admissions. Aside from baldly claiming confusion, Coleman did not explain, let alone "reasonably explain," how he was able to recall in such detail the statements about the 769 loan made at the April 25 meeting, and then, moments after a recess, conclude it was all mistake. Besides, defendants have consistently admitted that the 769 loan came up in discussion, because they assert that Qiao rebuffed Profeta's proposal to pay off the 349 and LVP loans unless the 769 loan was paid too.

There is ample authority for holding that a lender would reasonably and in good faith deem itself insecure when the borrower states it does not intend to pay its obligation. In <u>First Bank of Savannah v. Kilpatrick-Smith Construction Co., Inc.</u>, 264 S.E.2d 576, 577 (Ga. App. 1980), the court held that a bank was

19

entitled to summary judgment on the question whether it in good faith deemed itself insecure and accelerated promissory notes where the borrowers "themselves informed officers of the defendant-bank that they would be unable either to pay the notes as they became due or put up additional collateral to secure payment." In United States v. Grayson, 879 F.2d 620, 623 (9th Cir. 1989), the court affirmed summary judgment for the bank, holding no rational factfinder could find the bank lacked good faith where it deemed itself insecure after the borrower missed one payment (we recognize 769 never missed) but then "advised . . . it would have difficulty making any further payments." See also Sturman v. First Nat'l Bank, 729 P.2d 667, 677 (Wyo. 1986) (affirming summary judgment where bank in good faith deemed itself insecure where debtor, among other things, brought federal action to rescind the debt).

Threats of bankruptcy — which imply a threat not to pay — also justify a finding of insecurity. See Fort Knox Nat'l Bank v. Gustafson, 385 S.W.2d 196, 199-200 (Ky. 1964) (holding that bank acted in good faith in accelerating a note based on insecurity where the borrower, among other things, discussed possible bankruptcy proceedings with bank's attorney); Jack M. Finley, Inc. v. Longview Bank & Trust Co., 705 S.W.2d 206, 208 (Tex. App. 1985) (affirming summary judgment granted bank that deemed itself insecure, stating that undisputed

20

evidence "that the debtor had threatened bankruptcy is a sufficient basis to establish the bank's good faith").[4]

In sum, we are satisfied that the Bank had an objectively reasonable basis to deem itself insecure and, based on that insecurity, to declare that 769 was in default, which caused 349 and LVP to be in default as well.

C.

The Bank also contends that 769's Debt Service Coverage Ratio fell below the required 1.25 to 1.00, which was another pre-maturity default that triggered the loan agreements' cross-default provision. This argument implicates Coleman's April 2017 statement of operations, which we discussed above regarding 769's net operating income. Assuming Coleman's submission was accurate, 769's net operating income was a mere fraction of its debt service, far less than the required 1.25 to 1.00 ratio.

---

[4] We recognize the courts in these cases applied their state's Uniform Commercial Code provision on insecurity. See UCC § 1-309 (stating that where a loan agreement authorizes a lender to accelerate a loan or require additional collateral when the lender "deems itself insecure," the lender "has the power to do so only if [it] in good faith believes that the prospect of payment or performance is impaired" and the borrower bears the burden to prove lack of good faith). See also former UCC § 1-208, which section 309 replaced. But the parties have not adverted to the UCC here. Therefore, we have not addressed it. Nonetheless, the foregoing cases are instructive on the issue of what causes a lender to deem itself insecure.

However, defendants contend that Coleman mistakenly characterized the Profeta leases as month-to-month. That mistake depressed the DSCR because the loan agreements expressly stated that only annual leases could be utilized in calculating the DSCR. Defendants argue that the Bank must have recognized Coleman's error, because Goldman had reviewed the leases earlier that month.

We may assume for argument's sake that there exists a genuine issue of material fact as to whether 769's DSCR did fall below 1.25 to 1.00. That disputed fact does not defeat summary judgment because there existed the other pre-maturity defaults by 769, which we have identified. Those defaults justified invoking the cross-default provisions and declaring 349 and LVP in default. Under the loan agreements, defendants were not entitled to prepay their loans if they were in default.

II.

Defendants also argue that the Bank breached the loan agreements and the covenant of good faith and fair dealing; that the bank acted inequitably; and that the grant of summary judgment was premature because discovery was incomplete.

We acknowledge that the Bank misinterpreted the loan agreements. As the federal court discussed, so did defendants. For its part, the Bank insisted,

22

mistakenly, that to be able to prepay their loans, each defendant had to pay 115 percent of the then outstanding loan principal, which could be allocated to the other outstanding loans once the defendant's debt was satisfied. Profeta correctly protested that the 115 percent provision only applied if a defendant sold the property directly to a third party; and Profeta proposed to prepay the loan with his own funds first and then sell the property to a third party. As noted above, the Bank also initially sent default notices to defendants alleging direct defaults by them based on material adverse changes and insecurity; but the record is barren of any evidence justifying those notices of default.

However, those mistakes do not constitute material breaches of the loan agreements. In order to prepay their loans, defendants were required to provide written notice, at least fifteen days before prepayment. Profeta gave written notice by letter dated May 10, 2017, that he intended to prepay the 349 and LVP loans on June 1, 2017, and sought the Bank's assurance that it would release the associated liens. But before June 1, 2017, the Bank declared the cross-default. And, as the federal court found, defendants were not entitled to the liens' release if defendants were in default. LVP Assocs., 2017 U.S. Dist. LEXIS 190188, at *17-*22. Thus, regardless of the Bank's unjustified demand of 115 percent and its unsupported default notices, defendants were not entitled to the release of the

23

liens if it prepaid the two loans. And defendants clearly proposed to prepay the loans only if they could secure the liens' release, so they could sell the properties.

Defendants also argue that they were not in default because the notices of default were not issued in compliance with the Bank's internal practices, including those of its Loan Risk Subcommittee. However, we are unaware of any authority — and defendants point to none — that a borrower may defend a default on the ground that the lender did not follow its own internal guidelines, even if the default was justified under the borrower's agreement with the lender. Defendants lack standing to object to the bank's compliance with its own internal practices. Cf. Rajamin v. Deutsche Bank Nat'l Trust Co., 757 F.3d 79, 87-90 (2d Cir. 2014) (holding that mortgagors lacked standing to complain of foreclosing lender's alleged violation of a securitization trust agreement). In any event, even if Anthony Wong, a Bank vice president and author of the default letters, lacked authority to declare defendants in default — because he violated internal guidelines of the Bank — his actions were not void; they were only voidable, at the election of his principal, the Bank, and the Bank did not elect to do so. See id. at 89 (concluding that unauthorized acts of a trustee may be ratified by the trust's beneficiaries, as such acts are "not void but merely voidable by the beneficiary").

24

We also reject defendants' claim that the Bank breached the implied covenant of good faith and fair dealing, in refusing to release the liens upon Profeta's proposed repayment. Every contract contains "an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'" Ass'n Grp. Life, Inc. v. Catholic War Veterans, 61 N.J. 150, 153 (1972) (quoting 5 Williston on Contracts § 670, 159-160 (3d ed. 1961)).

"[A] debtor may defend against enforcement of lender's rights where the lender has engaged in bad faith, misconduct or the like." Nat'l Westminster Bank NJ v. Lomker, 277 N.J. Super. 491, 496 (App. Div. 1994). However, the "good faith requirement does not impose upon a lender obligations that alter the terms of its deal or preclude it from exercising its bargained for rights." Ibid. Put another way, the covenant of good faith and fair dealing "may not be invoked by a commercial debtor to preclude a creditor from exercising its bargained-for rights under a loan agreement." Glenfed Fin., 276 N.J. Super. at 175 (rejecting argument that lender breached the covenant).

Defendants contend the Bank schemed to grab the profits that defendants projected for themselves if they had been able to consummate the sale of 349's

25

and LVP's buildings once it prepaid the loans and the liens were released. But the record evidence shows that the Bank was not grabbing profits; it was avoiding losses. Defendants wanted to pay off their loans and get their liens released, while letting 769, which was undercollateralized by $6 million, head for predicted default. The loan agreements' cross-default provisions entitled the Bank to abate its projected loss by declaring defaults by 349 and LVP.

Both defendants and the Bank are sophisticated parties. They sought to exploit their contractual rights to maximum benefit. We discern no genuine issue of material fact regarding the alleged breach of the covenant of good faith and fair dealing.

For the same reasons that we reject defendants' good-faith-and-fair-dealing argument, we reject defendants' argument that the Bank's inequitable conduct bars it from the equitable remedy of foreclosure. This is not a case where the lender caused the borrower's default by interfering with its business. Cf. Leisure Technology-Northeast, Inc. v. Klingbeil Holding Co., 137 N.J. Super. 353, 355-56 (App. Div. 1974).

Finally, we consider defendants' contention that summary judgment was premature because discovery was not complete. "A motion for summary judgment is not premature merely because discovery has not been completed

. . . ." Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015). Rather, to defeat summary judgment based on incomplete discovery, the opponent must "demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action," or the defense. Ibid. (quoting Wellington v. Est. of Wellington, 359 N.J. Super. 484, 496 (App. Div. 1977)). See also Friedman v. Martinez, 242 N.J. 449, 472 (2020) (rejecting argument that summary judgment was premature).

Defendants want to depose Wong and Bank of China New York Branch president Chen Xu, and further depose Qiao. In part, defendants seek further information regarding the Bank's compliance (or non-compliance) with its own internal guidelines. But we have already rejected that line of attack. Defendants have not shown that the requested depositions would likely undermine the Bank's claim that 769 defaulted, and, consequently, defendants did, too. Thus, the discovery defendants sought would not have supported the release of the liens they claim was necessary for the prepayment of their loans.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27